INTERNATIONAL BUSINESS MACHINES CORPORATION, Petitioner,

v.

Howard S. LEVIN and Levin Computer Corporation, Respondents,

and

Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, Nominal Respondent.

Howard S. LEVIN and Levin Computer Corporation, Cross-Appellants, No. 78–1113,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, Appellant, Nos. 78–1065 & 78–1074,

Carpenter, Bennett & Morrissey, Cross-Appellant, No. 78–1114.

Nos. 78–1064, 78–1065, 78–1074, 78–1113 and 78–1114.

United States Court of Appeals, Third Circuit.

Argued March 30, 1978.

Decided June 19, 1978.

As Amended June 28, 1978.

Max O. Truitt, Jr., Wilmer, Cutler & Pickering, Washington, D. C., for International Business Machines Corp.

Laurence B. Orloff, Orloff, Lowenbach, Stifelman & Siegel, Newark, N. J., for Howard S. Levin and Levin Computer Corp.

Walter F. Waldau, Stryker, Tams & Dill, Newark, N. J., for Carpenter, Bennett & Morrissey.

Before GIBBONS, MARIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

MARIS, Circuit Judge.

This petition for a writ of mandamus and these appeals and cross-appeals seek our review of an interlocutory order of the United States District Court for the District of New Jersey entered in this private antitrust suit directing Carpenter, Bennett & Morrissey (herein "CBM"), counsel for the plaintiffs, Howard S. Levin (herein "Levin") and Levin Computer Corporation (herein "LCC"), to withdraw from the case and allowing CBM to turn over its past work on the case to substitute counsel for the plaintiffs with consultation with such counsel to effect the turnover permitted for a period of sixty days.

The plaintiffs' lawsuit against the International Business Machines Corporation (herein "IBM"), alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and of the laws of the State of New Jersey, was filed about ten months after Levin caused LCC to be incorporated under the laws of New Jersey for the purpose, stated in the complaint, of engaging in the business of purchasing for lease certain data processing equipment manufactured by IBM, known as the 370 series or IBM fourth generation computer equipment. When IBM refused to extend installment credit to Levin and LCC on other than terms which the latter considered to be unfair and unreasonable, this action was filed, on June 23, 1972, in the Superior Court of New Jersey, Chancery Division, Essex County. The suit was subsequently removed to the district court.

The amended complaint filed in the district court asserts that IBM illegally perpetuates a monopoly position in the manufacture, distribution and ownership of computers and in particular of fourth generation or 370 series computers in New Jersey and throughout the United States by maintaining policies and practices which discourage sales of that equipment and force users to lease it directly from IBM at arbitrarily high rentals. The relief sought is an injunction against IBM's further use of alleged anticompetitive and discriminatory practices with respect to the distribution of its fourth generation computers as well as damages, an order directing IBM to grant the plaintiffs installment credit on reasonable terms which would permit their purchase of the computers, related items and services and an order directing IBM to sell

its fourth generation computers to LCC by installment sale.

Shortly after the filing of the amended complaint, the plaintiffs applied to the district court for a preliminary injunction directing IBM to extend installment credit to LCC for the purchase of IBM computer equipment. The motion was denied. An appeal was taken to this court at our No. 72–1843 and on June 4, 1973, we entered an order affirming the district court's decision.

In December 1973 the plaintiffs moved in the district court for partial summary judgment or in the alternative for a preliminary injunction ordering IBM to rent certain components of IBM computer equipment to LCC for integration into computers not owned by IBM. This motion also was denied by the district court. On appeal to this court at our No. 74–1304, we affirmed by an order entered October 31, 1974. Thereafter, both parties undertook extensive discovery in the district court and trial before the court was set for September 1977.

In June 1977 IBM moved for an order disqualifying CBM from further participation in the case on the ground that the law firm had represented both the plaintiffs and IBM during the pendency of the action in the district court in violation of the disciplinary rules of the Code of Professional Responsibility of the American Bar Association which had been adopted by the district court as the standards of ethical conduct which practitioners before the court are required to observe.

The district court, on the basis of depositions, affidavits and briefs filed with it and after hearing arguments of counsel for IBM and CBM and new counsel for the plaintiffs, disqualified CBM from further representation of the plaintiffs in the case but permitted CBM to turn over its past work product on the case to the plaintiffs' new counsel and allowed consultation between CBM and the plaintiffs' substitute counsel with respect thereto for a period of sixty days. The order of disqualification was entered in the district court by Judge Meanor December 28, 1977. An amended order which clarified CBM's right to appeal from

the order of disqualification was entered January 9, 1978. Since the latter contains all the significant provisions of the original order, we confine our discussion to it.

IBM petitioned this court for a writ of mandamus directing Judge Meanor to prohibit the turnover of CBM's past work product and consultation between CBM and the plaintiffs' substitute counsel for a period of sixty days following disqualification. IBM, in addition, appealed from the portions of the district court's order which permit such turnover of work product and consultation. IBM also moved to stay the portions of the order concerning which it seeks review, to consolidate its appeals and petition for mandamus for review purposes and to expedite briefing.

CBM and the plaintiffs cross-appealed from the district court's order disqualifying CBM. Their appeals raise questions concerning the applicability to CBM of the ban of the American Bar Association's Code against a lawyer's dual representation of adversaries and the appropriateness of the sanctions of disqualification and total withdrawal after sixty days in the circumstances of this case. CBM and the plaintiffs moved this court to dismiss IBM's appeals and petition for mandamus for lack of jurisdiction and for IBM's failure to demonstrate any prejudice or injury to its rights by reason of the portions of the order sought by it to be reviewed.

We granted the stay pending review requested by IBM, deferred IBM's petition for mandamus and CBM's motion to dismiss IBM's appeals and petition for consideration with the merits of the appeals and cross-appeals, ordered consolidation of the related cases and directed an expedited schedule of briefing. The case has now been argued and is before us for decision.

We turn then to outline the facts out of which this controversy arose. It appears that CBM had represented both Levin and the corporation with which he was then associated, Levin Townsend Computer Corporation (herein "LTC"), a computer leasing corporation, from 1965 to 1969. From 1966 to 1969 CBM performed considerable work

for LTC including representing the corporation in several disputes with IBM in connection with IBM's installment sale to LTC of IBM computer equipment. In January 1970 when Levin terminated his association with LTC, CBM withdrew as attorneys for LTC but continued to represent Levin sporadically in matters unrelated to LTC. In the latter part of 1971 CBM resumed an active attorney-client relationship with Levin. At that time CBM arranged for the incorporation of LCC on behalf of Levin. One of the firm's partners, Stanley Weiss, became a director of LCC and another, David M. McCann, assumed the office of secretary of the corporation.

LCC's effort in late 1971 and 1972 to secure installment credit on terms acceptable to it for the purchase of IBM equipment was handled by McCann dealing with Joseph W. S. Davis, Jr., counsel for IBM's Data Processing Division located in White Plains, New York. As LCC's prospects for a satisfactory credit arrangement with IBM diminished with IBM's successive rejections of LCC's applications for installment credit, Levin's determination to take legal action against IBM grew. In February 1972 McCann advised Davis of the plaintiffs' intention to file suit to enjoin IBM from imposing more stringent credit requirements on LCC than were applied to prospective lessees of the equipment LCC desired to purchase.

Davis reported this information to Nicholas Katzenbach, IBM vice-president and general counsel, and Chester B. McLaughlin, assistant general counsel, both working out of the general counsel's office located at IBM's corporate headquarters in Armonk, New York.

In March 1972 a meeting, attended by McCann and Weiss of CBM, Davis and R. G. O'Neill of IBM, and Levin and the treasurer of LCC, was held at LCC's New York City office in an unsuccessful attempt to resolve the dispute. IBM, thereafter, engaged the law firm of Riker, Danzig, Scherer & Debevoise to represent it in any ensuing suit. On June 23, 1972, CBM filed the present suit on behalf of the plaintiffs and has prosecuted it until the present time.

In April 1970 a member of IBM's legal staff in the general counsel's office at Armonk, Robert Troup, contacted Edward F. Ryan, a CBM partner and one of five members of the firm specializing in labor matters, for the purpose of retaining CBM's services in the preparation of an opinion letter for IBM regarding a jurisdictional dispute with an electrical workers' union. The CBM partners considered and rejected the possibility that acceptance of the IBM assignment in the labor matter might create a conflict of interest in the light of CBM's former representation of LTC. Ryan prepared an opinion on the jurisdictional dispute question and accepted a second assignment from Troup in July 1970 dealing with a union's right to picket IBM in the event IBM cancelled a subcontracting arrangement and a third assignment in May 1971 relating to the availability of injunctive relief against certain union picketing.

In April 1972 Ryan accepted Troup's telephoned request for another opinion letter in a labor matter concerning the right of temporary employees to form a separate bargaining unit. At this point Ryan's account of the facts diverges from that of Troup. Ryan's sworn statement is that his acceptance of IBM's fourth assignment caused him some concern since he was aware of CBM's current representation of LCC and LCC's difficulty in procuring credit from IBM. Consequently, a few days after Troup's call, Ryan consulted with McCann and Weiss about a possible conflict of interest in CBM's representation of both IBM and LCC simultaneously. Weiss informed Ryan of the contemplated antitrust suit against IBM and advised him to obtain IBM's consent to the firm's representation of both IBM and the plaintiffs. Ryan stated that shortly thereafter he called Troup at his Armonk office and in a conversation lasting about three minutes brought to Troup's attention the contemplated antitrust suit against IBM by CBM's client, Levin. Troup's response, according to Ryan's testimony, was that the matter was

not significant from IBM's point of view and he directed Ryan to proceed with the assignment given him. Various members of the CBM firm testified to their understanding at the time that Ryan had obtained IBM's consent to the dual representation. Troup, however, by affidavit and deposition, denied ever having been informed by Ryan of the proposed Levin lawsuit or that CBM might represent another client in a suit against IBM. CBM obtained Levin's consent to CBM's representation of IBM in labor matters and the antitrust suit was filed by Weiss acting for the firm June 23, 1972, one week after the completion of CBM's fourth opinion letter for IBM.

Weiss testified, also, in connection with IBM's knowledge of CBM's possible conflict of interest involving IBM, that in July 1973 while he and Charles Danzig, a partner of Riker, Danzig, Scherer & Debevoise, IBM's counsel in the antitrust suit, rode together in a train from Philadelphia to Newark, Weiss mentioned that CBM performed occasional work for IBM in labor matters. Danzig denied that such a statement was made to him by Weiss.

It is undisputed that during CBM's prosecution of the antitrust suit, Ryan accepted four additional labor relations assignments from Troup without further discussing with Troup CBM's concurrent representation of Levin and LCC. On February 2, 1974, Ryan was asked to represent IBM in effecting the recovery of IBM equipment from a warehouse in Edison, New Jersey operated by an employer who was experiencing labor problems with the Teamsters Union. Ryan's work in this matter included the preparation of a complaint in replevin against the warehouse operator which was never filed and an application for a writ of possession which was granted by the Superior Court of New Jersey, Law Division, Middlesex, but was not executed since the union and employer arranged for union members to deliver the equipment to IBM. Preparation of the application for a writ required CBM's receipt from IBM of a schedule identifying the various pieces of equipment and IBM customers involved.

In June 1974 Ryan was requested by Troup to represent IBM in a matter involving a claim of the Division of Weights and Measures of the State of New Jersey of jurisdiction over certain IBM equipment necessitating its approval of the sale and use of the equipment in New Jersey and the possible licensing of IBM maintenance engineers. Ryan referred the assignment to a CBM partner, Jerome J. Graham, Jr., who accepted it after being assured that CBM's representation of LCC in the pending antitrust suit had been previously cleared with IBM. Graham's participation in the matter, according to his affidavit, ended in August 1976.

In June and July 1976 Ryan was contacted by IBM attorneys requesting two opinion letters, one dealing with an employer's obligation in regard to supervisory employee's performance of certain work during a work stoppage and the second having to do with restrictions under New Jersey law on registered nurses' performance of certain medical examination procedures. The opinion letters were completed by CBM in July 1976.

Subsequently, at a law school alumni luncheon in New York City on January 28, 1977, John Lynch, a partner of CBM, met Richard McDonough, then a member of IBM's legal staff, and Lynch mentioned to McDonough his role in prosecuting the plaintiffs' antitrust suit against IBM. McDonough indicated surprise in that CBM was, to his knowledge, representing IBM in labor matters. In April 1977, at a dinner attended by McDonough and counsel for IBM in the antitrust suit, McDonough expressed to the latter an interest in knowing how CBM's conflict of interest had been reconciled to permit CBM's representation of Levin and LCC in the suit against IBM. McDonough's remarks caused IBM to investigate the matter further and led to the filing in June 1977 of the motion to disqualify CBM.

■ These being the facts we turn to the consideration of the questions raised by the parties. We first consider the questions of jurisdiction which have been raised. It is

clear that we have jurisdiction under 28 U.S.C. § 1291 to hear the appeals of the cross-appellants from the district court's order disqualifying CBM. *Akerly v. Red Barn System, Inc.*, 551 F.2d 539, 542–543 (3d Cir. 1977); *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1088 (3d Cir. 1976); *Kroungold v. Triester*, 521 F.2d 763, 765 (3d Cir. 1975); *American Roller Co. v. Budinger*, 513 F.2d 982, 983 (3d Cir. 1975); *Greene v. Singer Co.*, 509 F.2d 750 (3d Cir. 1971), *cert. denied*, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972). The disqualification order is a "collateral order" which, although it does not terminate the claims in litigation, does finally dispose of an issue entirely separable from and independent of those claims which involves the risk of irreparable injury and the loss of an important right if immediate review is denied. *See Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546–547, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

■ Our jurisdiction over the order of disqualification being clear, we think it extends, notwithstanding the restrictive nature of the collateral order doctrine, to those portions of the district court's order which spell out the nature and extent of the disqualification ordered. Our holding in *Akerly v. Red Barn System, Inc.*, 551 F.2d 539 (3d Cir. 1977), is distinguishable. In *Akerly* we concluded that our jurisdiction over an appeal from an order denying a motion to disqualify opposing counsel did not empower us to consider the district court's denial of a related motion to dismiss the complaint and the denial of dismissal did not become an appealable collateral order by reason of its basis in alleged attorney misconduct. Here, our jurisdiction is invoked only with respect to the grant of disqualification since the other portions of the district court's order which are sought to be reviewed are, in fact, integral parts of the disqualification proper.

■ The way is thus open to us to consider the contention raised by the cross-appellants that the district court abused its discretion in requiring CBM's total withdrawal from the case after sixty days. Since this issue is properly before us on the cross-appeals, we may entertain IBM's opposing contention, either on its separate appeals or as appellee on the cross-appeals, that the district court abused its discretion in granting the sixty-day consultation period. *Compare Consolo v. Federal Maritime Commission*, 383 U.S. 607, 615, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Moreover, even if the turnover issue had not been raised in the appeals or cross-appeals, our power of review over the disqualification order, once established as it is here, encompasses what is plainly an aspect of the reviewable order. *See Rhoads v. Ford Motor Co.*, 514 F.2d 931, 934 (3d Cir. 1975); *McCreary Tire & Rubber Co. v. CEAT S.p.A.*, 501 F.2d 1032, 1038 (3d Cir. 1974); 9 Moore's Federal Practice ¶ 110.25[1] at 273 (2d ed. 1973).

■ Since we conclude that we have authority to review all aspects of the district court's order raised in the appeals and cross-appeals, we need not consider further CBM's contention that that part of the district court's order which deals with the turnover of CBM's past work is not independently appealable under the *Cohen* collateral order doctrine[1] nor its argument that IBM, not having been prejudiced by the turnover decision, lacks standing as an aggrieved party to take an appeal from it. Accordingly, CBM's motion to dismiss IBM's appeals will be denied. CBM's motion to dismiss IBM's petition for a writ of mandamus will be granted, however. Since IBM is entitled to raise on the appeals and cross-appeals the issues which it has sought to raise by mandamus, the remedy of that extraordinary writ is foreclosed to it. *See Kerr v. United States District Court*, 426 U.S. 394, 403, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); *Ex parte Fahey*, 332 U.S. 258, 67

---

1. We note that the Seventh Circuit has recently held that an order denying to substitute counsel access to disqualified counsel's past work on the case from which the latter was required to withdraw is a reviewable collateral order. *First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 571 F.2d 390 (1978).

S.Ct. 1558, 91 L.Ed. 2041 (1947); *Roche v. Evaporated Milk Association*, 319 U.S. 21, 27–28, 63 S.Ct. 938, 87 L.Ed. 1185 (1943).

 We turn then to consider the order under review. If the facts found by the district court establish that practitioners before it have acted in a way which disqualifies them under its rules and established standards of professional conduct, it would ordinarily be error for the court to fail to declare the disqualification. But in its order of disqualification the court has a wide discretion in framing its sanctions so as to be just and fair to all parties involved. Except where purely legal issues are involved, the district court's action in these matters may be reversed only for a clear abuse of this discretion. *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1088 (3d Cir. 1976); *Kroungold v. Triester*, 521 F.2d 763, 765 (3d Cir. 1975).

CBM's principal contention does raise a legal question, however. It is that under a proper interpretation of the disciplinary rules of the American Bar Association's Code of Professional Responsibility which are in force in the district court an attorney who has asserted a claim against a client pursuant to his representation of a second client may continue to represent the first client with respect to matters unrelated to the lawsuit without disclosing fully the facts of the dual representation to the client being sued and without obtaining his consent.

The pertinent rule of the Code of Professional Responsibility, which Code the district court adopted in 1970 under its Local Rule 6 as the controlling standard of conduct for the members of the bar practicing before it,[2] provides as follows:

"DR 5–105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

"(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

"(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment."

CBM argues that clauses (A) and (B) of DR 5–105 are not applicable since no effect adverse to IBM resulted from CBM's concurrent representation of both IBM and the plaintiffs and no adverse effect on CBM's exercise of its independent professional judgment on behalf of IBM was likely to result from CBM's representation of these clients in two entirely unrelated areas. Since clauses (A) and (B) do not apply, CBM

---

2. It seems clear that the conduct of practitioners before the federal courts must be governed by the rules of those courts rather than those of the state courts. *See Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1088–1089 n. 6 (3d Cir. 1976); *Cord v. Smith*, 338 F.2d 516, 524 (9th Cir. 1964). However, we see no conflict here in the standards applied by the federal and state courts. In 1971 the Supreme Court of New Jersey adopted with some minor changes the disciplinary rules of the ABA Code. In 1976 the district court's Local Rule 6 was amended to provide that the conduct of practitioners before it was to be governed by the disciplinary rules of the Code as amended by the Supreme Court of New Jersey.

argues, the consent requirement of clause (C) of DR 5–105 also is not applicable.

We think that CBM takes too narrow a view of the meaning of the phrase "adversely affected" in clauses (A) and (B), and that a somewhat more generous interpretation is called for. The rule does not define the nature or extent of the adverse effect contemplated on the attorney's exercise of independent judgment. However, DR 5–105(C) makes clear that situations entailing the likelihood of an adverse effect include circumstances in which such an effect may be minor permitting the performance of adequate services in spite of it. In those cases the multiple representation may take place if the attorney believes in good faith that he can adequately represent both clients and if the consent of the clients is obtained.

We think, however, that it is likely that some "adverse effect" on an attorney's exercise of his independent judgment on behalf of a client may result from the attorney's adversary posture toward that client in another legal matter. See *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386–1387 (2d Cir. 1976); *Grievance Committee of the Bar of Hartford County v. Rottner*, 152 Conn. 59, 65, 203 A.2d 82, 84 (1964); Advisory Committee on Professional Ethics of the Supreme Court of New Jersey, *Opinion No. 282*, 97 N.J.L.J. 362 (1974), and *Opinion No. 301*, 98 N.J.L.J. 209 (1975). For example, a possible effect on the quality of the attorney's services on behalf of the client being sued may be a diminution in the vigor of his representation of the client in the other matter. See *Cinema 5, Ltd. v. Cinerama, Inc., supra* at 1387. A serious effect on the attorney-client relationship may follow if the client discovers from a source other than the attorney that he is being sued in a different matter by the attorney. The fact that a deleterious result cannot be identified subsequently as having actually occurred does not refute the existence of a likelihood of its occurrence, depending upon the facts and circumstances, at the time the decision was made to represent the client without having obtained his consent.

The cases relied upon by CBM do not support its argument that the Code rule can never be violated by concurrent representation of several clients absent a showing of a relationship in the subject matter of the multiple representation. Most of the cases cited by CBM concern instances where ethical improprieties were found and are, therefore, not authority here. In *Moritz v. Medical Protective Co.*, 428 F.Supp. 865 (W.D.Wis.1977), the challenge to multiple representation came from a former and not a current client. But as the Court of Appeals for the Second Circuit stated in *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976), in connection with the prosecution of a lawsuit by an attorney or his partner against an actively represented client as opposed to a former one, "The propriety of this conduct must be measured not so much against the similarities in litigation as against the duty of undivided loyalty which an attorney owes to each of his clients." 528 F.2d at 1386. The case of *City of Cleveland v. Cleveland Electric Illuminating Co.*, 440 F.Supp. 193 (N.D.Ohio 1977), aff'd 573 F.2d 1310 (6th Cir. 1977), cert. denied, —— U.S. ——, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978), also cited by CBM, involves a waiver of objections to an attorney's continuing representation of another client and is, therefore, also not apposite.

An attorney must be cautious in this area and, if he is to adhere to the high standards of professional responsibility, he must resolve all doubts in favor of full disclosure to a client of the facts of the attorney's concurrent representation of another client in a lawsuit against him. As the Second Circuit Court of Appeals has stated, "Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (1976). Indeed, in the present case the record indicates that the members of CBM themselves apparently took the same view

of the applicability of the disciplinary rules to their situation both during the course of the dual representation and, it appears, in their arguments and admissions in the district court.

During the course of CBM's representation of the plaintiffs and IBM, the firm twice considered the possibility of the existence of a conflict of interest which might require some responsive action by CBM, once in 1970 and again in 1972. It is significant that in the second instance, the one pertinent here, which occurred when IBM requested CBM to represent it in a labor matter shortly before the filing of the antitrust suit, Weiss, CBM's partner in charge of the prosecution of the antitrust suit against IBM, advised Ryan, the partner involved in the representation of IBM, to obtain IBM's consent to the dual representation. Ryan testified that he then made the disputed telephone call to Troup. Other CBM partners, Lynch and Graham, who became involved in the situation, Lynch in assisting Weiss and Graham in taking an assignment for IBM from Ryan, testified to their perception of the dual representation as one requiring full disclosure to IBM and its consent. Thus, at the time they were faced with the question of the propriety of their continuing representation of a client about to be sued or being sued by them, the involved members of the firm apparently considered that the better course was to obtain consent. Moreover, at the hearing on IBM's motion to disqualify CBM, held August 31, 1977, CBM's counsel twice indicated to the court his understanding that a law firm could not, with impunity, sue a client with whom it had a currently ongoing relationship.

Having, in spite of CBM's concession in the district court, nonetheless considered the legal point it raises here and having decided that the continued representation of a client being sued in an unrelated matter without the client's consent may be violative of the Code, in particular DR 5–105, we turn to the question of whether the district court erred in disqualifying CBM and, if not, whether the court abused its discretion in permitting CBM to turn over its work product to plaintiffs' new counsel during a period of sixty days.

■ The district court concluded that its rule applying the Code required that CBM obtain IBM's consent to the firm's representation of it after full disclosure of the facts of CBM's representation of the plaintiffs. In support of this conclusion the court made several findings. The court found as a fact that at all relevant times CBM had an on-going attorney-client relationship with both IBM and the plaintiffs. This assessment of the relationship seems entirely reasonable to us. Although CBM had no specific assignment from IBM on hand on the day the antitrust complaint was filed and even though CBM performed services for IBM on a fee for service basis rather than pursuant to a retainer arrangement, the pattern of repeated retainers, both before and after the filing of the complaint, supports the finding of a continuous relationship.

The court also found that although the services required of CBM by IBM dealt consistently exclusively with labor matters, this was not the result of any special arrangement between them and that at any time IBM, unaware of CBM's participation in the plaintiffs' action, might have sought CBM's assistance in legal matters more closely related to the lawsuit. Thus, it was perhaps fortuitous that CBM, as the court found, never acquired any confidential information from IBM useful in the prosecution of the antitrust suit.

These findings, with which we agree, support the district court's conclusion, which seems to us reasonable and just, that CBM was obligated in these circumstances at the very least to disclose fully to IBM the facts of its representation of the plaintiffs and obtain its consent.

■ The district court determined that CBM did not meet its burden of proving that such a full disclosure was made and that consent by IBM to CBM's dual representation was obtained thereafter. CBM asserts that disclosure and consent were not necessary in that IBM had constructive

knowledge of the pertinent facts since its labor lawyers knew of CBM's representation of IBM in that area and its lawyers handling the defense of IBM in the antitrust action knew of CBM's participation in that matter. This assertion is without merit. Clause (C) of DR 5–105 specifically imposes upon an attorney the burden of affirmatively providing disclosure and obtaining consent. Clearly, full and effective disclosure of all the relevant facts must be made and brought home to the prospective client.[3] The facts required to be disclosed are peculiarly within the knowledge of the attorney bearing the burden of making the disclosure. To accept CBM's position would be to engraft an unwarranted exception on the requirement of DR 5–105 that disclosure must be sufficient to enable the prospective client himself to make an informed decision as to whether in the circumstances counsel will be retained. *See E. F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 398 (S.D. Tex.1969); *In re Kushinsky*, 53 N.J. 1, 4, 247 A.2d 665 (1968).

CBM alternatively argues that IBM's consent was in fact obtained. As we have stated earlier, Ryan testified that he called Troup at the IBM Armonk headquarters in April or May 1972 for the express purpose of informing Troup of the facts of CBM's representation of the plaintiffs and that Troup, after hearing the disclosure, directed Ryan to proceed with the preparation of the requested opinion in the labor matter. It appears that a telephone call lasting no more than three minutes was placed from Ryan's Newark office on May 3, 1972, to Troup's office in Armonk. Troup denied that he ever received the information which Ryan alleged had been conveyed and denied having given the consent Ryan alleged he sought to elicit or having had the authority to do so. Weiss testified that in July 1973 he had in a casual conversation with Danzig, IBM's counsel in the antitrust suit, mentioned that IBM employed CBM to perform occasional legal services in labor matters. Danzig denied that the statement was made to him by Weiss.

The district court did not deem it necessary to resolve these issues of credibility between Ryan and Troup and between Weiss and Danzig since it determined that even accepting CBM's version of this disputed testimony a full and adequate disclosure as required by DR 5–105 had not been made to IBM and that the IBM antitrust attorneys did not in fact know during the relevant period that CBM was representing IBM in labor matters. We conclude that the district court did not err in so determining and in concluding that since IBM's informed consent to the concurrent representation by CBM of it and the plaintiffs had not been obtained, CBM had violated DR 5–105. While we accept the district court's finding that the antitrust lawyers in IBM's legal department did not know that its labor lawyer in the same department was repeatedly retaining the services of CBM in labor matters, we cannot refrain from expressing our belief that such a situation could not have existed for over five years if the activities of the IBM legal department had been properly coordinated and controlled. Apparently in IBM's case the practice was to "let not thy left hand know what thy right hand doeth", a Biblical[4] injunction directed to almsgiving which is hardly applicable to the internal operation of a corporate legal department.

CBM and the plaintiffs urge that even if CBM is held to have violated DR 5–105, the district court's disqualification of CBM from the case is too harsh a sanction and

---

**3.** In the words of Justice Story, "An attorney is bound to disclose to his client every adverse retainer, and even every prior retainer, which may affect the discretion of the latter. No man can be supposed to be indifferent to the knowledge of facts, which work directly on his interests, or bear on the freedom of his choice of counsel. When a client employs an attorney, he has a right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity." *Williams v. Reed*, 3 Mason 405, 418, Fed.Case No. 17,733 (C.C.Maine 1824).

**4.** Matthew 6:3.

penalizes the plaintiffs unnecessarily in view of the termination of CBM's relationship with IBM and the district court's finding that, in the course of its representation of IBM, CBM did not obtain any information which would aid it in the prosecution of the antitrust suit against IBM.

 In considering this contention, we bear in mind the proposition that the plaintiffs do not have an absolute right to retain particular counsel. *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1093 (3d Cir. 1976). The plaintiffs' interest in retaining counsel of its choice and the lack of prejudice to IBM resulting from CBM's violation of professional ethics are not the only factors to be considered in this disqualification proceeding. An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public. The maintenance of the integrity of the legal profession and its high standing in the community are important additional factors to be considered in determining the appropriate sanction for a Code violation. *See Hull v. Celanese Corp.*, 513 F.2d 568, 572 (2d Cir. 1975). The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety. *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1088–1089 (3d Cir. 1976); *Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1385–1386 & n. 12 (3d Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). *See also Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976). Indeed, the courts have gone so far as to suggest that doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification. *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975); *Chugach Elec. Ass'n v. United States D.C. for Dist. of Alaska*, 370 F.2d 441, 444 (9th Cir.), *cert. denied*, 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967). Mindful of these considerations, we cannot say that the district court erred in ordering the disqualification of CBM.

It is true that the plaintiffs will be injured by the disqualification of CBM, their counsel for a number of years. Here the district court ameliorated the harsh effect upon the plaintiffs of its sanction against CBM by permitting the turnover to substitute counsel for the plaintiffs within sixty days of the past work product of CBM on the case. IBM contends that the allowance of a turnover of work product with consultation, particularly work product prepared after the filing of IBM's motion, was an abuse of discretion.

In support of its contention IBM cites *First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 571 F.2d 390 (7th Cir. 1978), and *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir. 1977). To the extent that the Seventh Circuit Court of Appeals lays down a legal tenet in *First Wisconsin Mortgage Trust* against permitting the turnover of a disqualified attorney's work product, we disagree, but we note that the court in that case expressly limited its holding to the facts of the case. 571 F.2d 390, 399. *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir. 1977), also cited by IBM, involves a complex situation not comparable to the facts present here. It deals with the question of the disqualification of counsel because of his relationship with disqualified co-counsel and in it the court does not address the question of the turnover of a disqualified attorney's work product.

 As we have already indicated, disqualification in circumstances such as these where specific injury to the moving party has not been shown is primarily justified as a vindication of the integrity of the bar. We think the turnover provisions of the district court's order of disqualification are sufficient for that purpose and a proper exercise of the court's discretion.

We have considered the other contentions of the parties but find them so lacking in merit as to require no discussion here.

The petition for a writ of mandamus will be dismissed and the order of the district court as amended will be affirmed.