652

## North Penn Hospital v. Hughes Foulkrod Construction Co.

*Edward J. Hardiman*, for plaintiff.
*John J. McAleese, Jr.*, for defendant.

BROWN, *J.*, November 19, 1981—On December 23, 1980, plaintiff North Penn Hospital (North Penn) filed a complaint in equity seeking to enjoin defendant Hughes-Foulkrod Construction Co. (Hughes-Foulkrod) from proceeding in arbitration in New Jersey before the American Arbitration Association. In substance, the complaint alleges the matters sought to be arbitrated are not arbitrable within the meaning of a contract between North Penn, as owner, and Hughes-Foulkrod, as general contractor, to construct a new hospital building. Defendant filed an answer, new matter and counterclaim on January 23, 1981, seeking a court order directing North Penn to proceed to arbitration.

On February 20, Hughes-Foulkrod filed a petition seeking the disqualification of the law firm of

Pearlstine, Salkin, Hardiman and Robinson (hereinafter "Pearlstine firm") as counsel for North Penn in this litigation alleging an attorney-client relationship between that firm and Hughes-Foulkrod and its president, Donald S. Hain at all times relevant.

North Penn, Jules Pearlstine, Esq., and the Pearlstine firm joined in an answer and new matter to the petition asserting that at all material times, Hughes-Foulkrod was aware of the Pearlstine firm's representation of North Penn and had agreed, in the event of a dispute, the firm would continue to represent North Penn without objection by Hughes-Foulkrod. Hearings on the disqualification issue were held on June 2, 3, 8, and 24, 1981.

Donald Hain first used the Pearlstine firm's services in 1975 for personal matters. That representation continued on and off into 1980. Hughes-Foulkrod was first represented in connection with the North Penn building project in 1978. A letter dated August 1, 1978, from Jules Pearlstine to Donald Hain, sets out the firm's agreement to represent Hughes-Foulkrod. Pertinent to this dispute is a declaration that the firm had not received any confidential information from Hain regarding the hospital project, and the following proviso: "In the event any dispute between North Penn Hospital and Hughes-Foulkrod Construction Company, you [Hain] have agreed that we [the Pearlstine firm] may continue to represent the North Penn Hospital in any capacity or such matter that might arise."

A copy of the letter was signed by Hain and returned to Pearlstine as an acknowledgment of the agreement.

Therefter, Philip Salkin, Esq., of the Pearlstine firm drafted a contract whereby Hughes-Foulkrod

bought out Medical Care Systems, Inc.'s interest in the joint venture project with North Penn. Earlier, in July, 1977, North Penn had entered into a contract with the joint venture of Medical Care Systems, Inc. and Hughes-Foulkrod. Hain acknowledges that he was not represented by the Pearlstine firm in that transaction.

In 1979 and continuing into early December, 1980, the Pearlstine firm represented Hughes-Foulkrod in a number of corporate matters including some dealings with North Penn. Ronald Robinson, a partner in that firm, was contacted in early March, 1980 by a member of North Penn's board of directors, who requested he prepare an agreement which was subsequently executed on March 14, 1980, by Hain and Earl Caffrey, then North Penn's president. The terms of the agreement were worked out during telephone conversations between Robinson and Albert Hoffman, a North Penn director, and Robinson and Hain.

A meeting took place on March 14, 1980 at the firm's office. In attendance were Hain, Caffrey, Hoffman, George Walmsley, a North Penn financial officer, Robert McKay, North Penn Executive Vice-President, Connie Falber, a board member and Robinson. Robinson was the only attorney present. He testified he was acting, with respect to the preparation and execution of the agreement, as counsel solely for North Penn, not Hain or Hughes-Foulkrod. However, this was not expressed to Hain or the others at the time. Hain says he thought Robinson represented him.

The March 14, 1980 agreement called for the payment of $75,000 by North Penn to Hughes-Foulkrod, in accordance with the following paragraph:

2. Owner [North Penn] hereby agrees that in the event Contractor [Hughes-Foulkrod] has completed the new North Penn Hospital and site at the hereinbefore-designated location to the satisfaction of Owner by March 24, 1980, Owner will pay unto Contractor the sum of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) within thirty (30) days from March 24, 1980. Contractor hereby agrees that the SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) lump-sum payment *shall include any and all claims of Contractor for change orders incurred as of March 24, 1980, prior thereto or thereafter unless said change orders are approved by Owner in writing. In addition thereto, said SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) lump-sum payment shall include but not be limited to, any and all expenses for labor, material of any nature whatsoever incurred by Contractor in completing the new Hospital Building and site for Owner, along with any claim or costs for raising of any ceilings, overtime payments, or anything of any nature in regard thereto, and Contractor hereby agrees and releases Owner from all liability in regard thereto.* (Emphasis supplied.)

The underscored language, purportedly releasing North Penn from liability, was relied on in part by North Penn in this action to enjoin arbitration.*

On July 10, 1980, Jules Pearlstine, Esq. conferred with Hain concerning the North Penn contract

---

*North Penn's Supplemental Brief in the disqualification proceeding, referring to argument on the merits made January 29, 1981, stated North Penn's position, that "Change Order no. 6 [the March 14, 1980 agreement] released North Penn Hospital from all liability." North Penn Supplemental Brief at p. 7.

as shown by a bill addressed to him on August 21, 1980. At that time they discussed raising the ceiling of the X-ray room, soil problems at the construction site, an extra 12,000 square feet built beyond specifications, and other and more general community affairs which Hain saw as affecting the prospect of his company being paid for what he viewed as legitimate claims for extras.

The Ethical Considerations of the Code of Professional Responsibility adopted by the Supreme Court of Pennsylvania on February 27, 1974, are "aspirational in character and represent the objectives toward which every member of the profession should strive" (quoting Code of Professional Responsibility, Preliminary Statement). The pertinent Ethical Considerations state:

EC 5-14. Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant.

EC 5-15. If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. . . .

The Disciplinary Rules of the Code of Professional Responsibility "are mandatory and 'state the minimum level of conduct below which no lawyer

can fall without being subject to disciplinary action.'" American Dredging Co. v. City of Philadelphia, 480 Pa. 177, 180, 389 A. 2d 568, 570 (1978). Disciplinary Rule 5-105 provides in pertinent part:

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under D.R. 5-105(C).

(C) In the situations covered by D.R. 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

To justify disqualification on the ground of a conflict of interest, we must find (1) the existence of a prior attorney-client relationship between the party seeking disqualification and the attorney in question, and (2) the matters involved in the current action are substantially related to the subject matter of the former representation: Pennsylvania Power & Light Co. v. Gulf Oil Corp., 74 D. & C. 2d 431, 433 (1975), citing American Can Co. v. Citrus Feed Co., 436 F. 2d 1125 (5th Cir. 1971).

The existence of a prior attorney-client relationship between the Pearlstine firm and Hughes-Foulkrod is clear. The question is whether this action by North Penn to enjoin arbitration concerns matters substantially related to the subject matter of the former representation. While the Pearlstine firm represented Hughes-Foulkrod in a variety of matters unrelated to the hospital construction contract, there was representation of both in matters

involving the contract. Most significant are the circumstances surrounding the March 14, 1980 agreement and the meeting of July 10, 1980.

Robinson testified he represented only North Penn with regard to the drafting and execution of the March 14 agreement. However, from his own testimony, he did not make clear "after full disclosure . . . the possible effect of such representation on the exercise of his independent professional judgment." No mention was made of that "possible effect" at the meeting. What Robinson did do was go over the contract paragraph by paragraph for the benefit of those present explaining what each paragraph meant. That is not enough, and it is no answer to say that two years before on August 1, 1978 Hain acknowledged that in case of any dispute, the Pearlstine firm would continue to represent North Penn Hospital. No effective disclosure within the meaning of Rule 5-105(C) can be said to have occurred. The purported consent by Hain in the 1978 letter to the Pearlstine firm's representation of North Penn was too general and too far in the past to meet the requirements of the code. It was given without disclosure of the possible effect of such dual representation on the exercise of the firm's independent professional judgment on behalf of each client.

The March 14 agreement, by Robinson's testimony, was drafted after consultation with Albert Hoffman of North Penn as well as Hain, parties clearly holding conflicting interests. While Robinson testified that he did not represent Hain and Hughes-Foulkrod, he did not say as much at the time. In view of the many and varied corporate matters in which the Pearlstine firm had represented his company during the previous year, it was not unreasonable for Hain to understand oth-

erwise. Full disclosure dictated a specific exposition on March 14 of just how his company's interests might be adversely affected by the firm representing North Penn in that transaction. But he was not even told that only North Penn was represented and that his company's interests would be better served if he employed other counsel. Under the circumstances he reasonably believed he was represented by the Pearlstine firm or that the firm was representing both his company and North Penn in the preparation and execution of that agreement. Indeed if Hain, despite his testimony to the contrary, viewed Robinson only as counsel to North Penn at the time, the requirements of Rule 5-105(c) were not met, for it was not "obvious that [Robinson could] adequately represent the interest of each," nor "exercise his independent professional judgment on behalf of each." What is obvious is that the same firm could not adequately represent the interests of both owner and contractor in the course of an ongoing, lengthy construction contract. If, as the August 1, 1978 letter suggests, the Pearlstine firm was to represent Hughes-Foulkrod and North Penn both in some aspects of future dealings and only North Penn in others, that would have required a nimbleness of foot round the code beyond the capacity of any lawyer. During the life of such a contract, there will inevitably be disputes wherein the confidences of one client, revealed earlier to counsel, will color his "exercise of independent professional judgment" and adversely affect that client's interests. What better proof is there than the present dispute concerning the meaning of the March 14 agreement.

Four months later at the conference on July 10, at a time when the growing dispute had ripened, there was a discussion of some depth between Jules

Pearlstine, Esq., and Hain, at which time Hain aired a number of the problems which he was having with the contract. Beyond question Pearlstine represented Hughes-Foulkrod on that occasion as shown by the bill rendered to the company on August 21. Indeed, the following day another bill to Hain proposed a retainer fee arrangement in view of the many and varied services that the firm had performed for Hughes-Foulkrod in the past.

The matters discussed at that meeting on July 10, as well as the contract of March 14, 1980 are at the heart of the current dispute so the second of the two requirements for disqualification have been met: Pennsylvania Power & Light Company v. Gulf Oil Corporation, supra.

In International Business Machines, Corp. v. Levin, 579 F. 2d 271, 283 (3d Cir. 1978), the court stated:

The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety. . . . Indeed, the courts have gone so far as to suggest that doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification.

We have no doubt as to the existence of a conflict of interest in the multiple representation of Hughes-Foulkrod and North Penn. Accordingly, we enter the following

## ORDER

And now, November 19, 1981 defendant's petition for disqualification is granted; the members and associates of the law firm of Pearlstine, Salkin,

Hardiman & Robinson are disqualified from representing North Penn Hospital in this action. A hearing is set for Tuesday, December 8, 1981 at 9:30 a.m. in Court Room "4" to determine to what extent, if any, work product may be turned over to substitute counsel and consultation between counsel will be permitted. Plaintiff is directed to advise substitute counsel to be present at the hearing on December 8.

## ORDER

And now, January 7, 1982, after hearing on December 8, 1981 and the exchange of letters between counsel and the court, the order of November 19, 1981 is implemented as follows:

There is to be no communication between Jules Pearlstine, Esq. and Ronald E. Robinson, Esq., as directors of the North Penn Hospital and the members of the law firm of Pearlstine, Salkin, Hardiman & Robinson on the one hand, and the members of the firm of Power, Bowen & Valimont on the other hand, concerning any matter having to do with the construction contract between North Penn Hospital and Hughes-Foulkrod Construction Co. or any litigation which has or which may arise out of that contract; provided, however:

1. Communication is permitted insofar as it is necessary to prepare members of the firm of Pearlstine, Salkin, Hardiman & Robinson to testify; the discussions for such purpose are to include factual matters directly pertinent to such testimony only;

2. All documents listed in the letter of October 15, 1981 from Edward J. Hardiman, Esq., to John J. McAleese, Jr., Esq. may be turned over to the firm of Power, Bowen & Valimont.