**The CHRONICLE PUBLISHING COMPANY, Plaintiff,**

**v.**

**James P. HANTZIS, Joseph V. Stuart, Mary Stuart, Robert E. Anderson, Margaret Anderson, Joseph V. Stuart and Robert E. Anderson, Trustees of Wedgewood Realty Trust, Double D Construction Company, Inc., and Dion & Sokol Associates, Inc., Defendants.**

**Civ. A. No. 89–2597–MA.**

United States District Court, D. Massachusetts.

March 14, 1990.

Michael P. Angelini, Louis Ciavarra, Bowditch & Dewey, Worcester, Mass., Michael B. Keating, Gary C. Crossen, Annemarie Hassett, Foley, Hoag & Eliot, Boston, Mass., for plaintiff.

Burton Chandler, Seder & Chandler, Worcester, Mass., for Double D.

Albert F. Cullen, Cullen & Butters, Boston, Mass., for Margaret Anderson.

Robert Cordy, Nancy Brush, Burns & Levinson, Boston, Mass., for Robert Anderson, Ind. and as Trustee of Wedgewood Realty.

Joel A. Kozol, Robert D. Kozol, Friedman & Atherton, Boston, Mass., for Joseph Stuart, Ind., and Trustee, and Mary Stuart.

Donahue & Donahue, Peter V. Lawlor, Lowell, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This order addresses the pending motions of two defendants, Robert E. Anderson ("Anderson") and Joseph V. Stuart ("Stuart").[1] Both defendants have filed motions to dismiss the complaint with prejudice, or in the alternative, to disqualify the plaintiff's law firm of Bowditch & Dewey and to enjoin Bowditch & Dewey from discussing or disseminating their work product with the plaintiff's substitute counsel.

### I.

Stuart and Anderson formerly owned the stock and operated the businesses of Beacon Communications Corporation ("Beacon") and Micro–Business Technologies, Inc. ("Micro"). In September of 1984, the defendants sold eighty percent of their Beacon stock interest and one hundred percent of their Micro stock ownership to Worcester Telegram and Gazette, Inc. ("WT & G"). During this transaction, Stuart and Anderson were represented by attorney Edward Sokoloff and WT & G was represented by its longstanding counsel, Bowditch & Dewey. After WT & G acquired Beacon and Micro, Stuart and Anderson agreed to remain as corporate officers and directors for a five year period, and Bowditch & Dewey became general counsel for Beacon and Micro as well.

In February of 1985, Beacon, now owned substantially by WT & G and partially by the defendants, sold the operations of Micro to Wayne F. Peak ("Peak") and his wholly-owned corporation Media Business Service, Inc. ("Media"). As a result of the sale, Stuart, Anderson and WT & G each received a six and two-thirds minority stockholder interest in Media. Two months later, the defendants sold the balance of their twenty percent Beacon stock ownership to WT & G and continued their service to the company at consultant status. The plaintiff, The Chronicle Publishing Company ("Chronicle"), acquired all the issued and outstanding stock of WT & G in November of 1986 and maintained the ongoing relationship with WT & G's corporate counsel, Bowditch & Dewey.[2]

In 1986 and 1987, Bowditch & Dewey became involved in two state lawsuits on behalf of their clients WT & G and Beacon, both of which generated from Beacon's sale of Micro assets to Peak and Media in February of 1985.[3] In Peak I, Beacon sued for the return of computer software that had been leased to Media; Peak and Media counterclaimed against Beacon, alleging fraud in the inducement by Stuart and Anderson, as officers and directors of Beacon, during the negotiations of the sale of Micro to Media. Although Stuart and Anderson were not parties to the Peak I litigation, attorneys for Bowditch & Dewey worked with both defendants while preparing Beacon's case for trial. As part of the litigation strategy in Peak I, Bowditch & Dewey initiated a minority shareholders' derivative suit against Media on behalf of WT & G. Stuart and Anderson were also

---

**1.** Anderson and Stuart each present their motions individually and as Trustees of Wedgewood Realty Trust; their motions are joined by their wives, Margaret Anderson and Mary Stuart, who are also named defendants.

**2.** After the November 21, 1986 acquisition, Beacon and WT & G existed as wholly-owned subsidiaries of Chronicle. On August 31, 1988, Beacon was merged into WT & G, which in turn was merged into Chronicle. Accordingly, Beacon and WT & G no longer existed as separate corporate entities as of August 31, 1988, and Chronicle has succeeded to all the rights and claims formerly held by WT & G and Beacon.

**3.** *See Beacon Communications Corporation v. Media Business Services, Inc. and Wayne F. Peak,* Commonwealth of Massachusetts, Middlesex Superior Court, Civil Action No. 86–2330, filed April 8, 1986 ("Peak I") and *Robert Anderson, Joseph Stuart and The Worcester Telegram and Gazette, Inc. v. Media Business Services, Inc. and Wayne F. Peak,* Commonwealth of Massachusetts, Middlesex Superior Court, Civil Action No. 87–2646, filed May 7, 1987 ("Peak II").

named as plaintiffs in this Peak II claim.[4] On December 7, 1987, the trial judge in Peak I entered a judgment for Beacon, which is now on appeal. The Peak II action is still pending after nearly three years of relative inactivity.

The plaintiff Chronicle filed the instant complaint on November 15, 1989, seeking recovery against the various defendants for civil violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.*, along with pendent state law claims including deceit, conversion, breach of contract, breach of fiduciary duty, unjust enrichment, rescission, civil conspiracy, joint tort liability and unfair and deceptive trade practice, Mass.Gen.L. ch. 93A. This complaint stemmed from an investigation conducted independently by Chronicle, the results of which were presented to Bowditch & Dewey in February of 1989. When it became clear that Chronicle would pursue its claims against Stuart and Anderson, Bowditch & Dewey informed the defendants that the law firm could no longer represent them as shareholder-plaintiffs in the pending Peak II litigation.[5] Stuart and Anderson then engaged separate counsel, who worked unsuccessfully with Bowditch & Dewey throughout the summer and fall of 1989 to negotiate a settlement of Chronicle's claim.

Stuart and Anderson now present motions to dismiss the complaint, or alternatively, to disqualify Bowditch & Dewey and enjoin the dissemination of its work product. The defendants contend that Chronicle's complaint is tainted with confidential information which Bowditch & Dewey obtained from Stuart and Anderson during the course of the Peak I and Peak II litigation. The defendants argue that the conduct of Bowditch & Dewey violates Canons 4, 5, and 9 of the Canons of Ethics and Disciplinary Rules Regulating the Practice of Law as adopted by the Supreme Judicial Court of Massachusetts ("SJC") in Rule 3:07 and by this court under Local Rule 5(d)(4)(B). The plaintiff submitted timely opposition, denying that Bowditch & Dewey either acted improperly or divulged any confidences, secrets or privileged information. In order to minimize the litigation delay of its client and to avoid any suggestion of unethical conduct, however, Bowditch & Dewey recommended that Chronicle retain substitute counsel and filed a request for leave of court to withdraw its appearance.

At a February 21, 1990 motion hearing, this court granted Bowditch & Dewey's request to withdraw as counsel for the plaintiff. Accordingly, the defendants' motions to disqualify Bowditch & Dewey are rendered moot. The conditions of Bowditch & Dewey's withdrawal and the turnover of its work product to the plaintiff's successor counsel are the issues before the court.

## II.

■ In framing an order regarding disqualification or the ethical standards of attorney conduct, this court has wide discretion "so as to be just and fair to all parties involved." *See International Business Machines Corp. v. Levin*, 579 F.2d 271, 279 (3rd Cir.1978). The court crafts this order with the intention of protecting all parties while upholding the ethical obligations inherent in the attorney-client relationship and safeguarding the attorney-client evidentiary privilege. I am also hopeful that the order will minimize the delay in what promises to be protracted and contentious litigation on all fronts.

■ The issues in Peak I and Peak II were substantially the same, and both involved the conduct of Stuart and Anderson as officers and directors of Beacon during the sale of Micro to Media. Bowditch & Dewey represented WT & G and Beacon as

---

4. Bowditch & Dewey, corporate counsel for WT & G, has neither billed Stuart and Anderson nor received payment from them for legal services rendered throughout the Peak I and Peak II litigation.

5. In April of 1989, Bowditch & Dewey sent correspondence to the defendants indicating their refusal to continue representing Stuart and Anderson in the Peak II state claim. Over the defendants' objections, the trial judge granted Bowditch & Dewey leave to withdraw from the Peak II lawsuit on December 18, 1989.

their corporate counsel. When Peak I was initiated, Beacon was owned by WT & G. By the time of the Peak II lawsuit, Chronicle controlled both Beacon and WT & G and still retained the legal services of Bowditch & Dewey. The communications between Stuart and Anderson and Bowditch & Dewey during the course of the Peak litigation concerned the activities of the defendants when they served as Beacon management officials. As corporations, Beacon, WT & G and Chronicle can communicate with counsel only through their officers, directors and employees, such as Stuart and Anderson. The power to invoke or waive a corporation's attorney-client privilege may be asserted only by current corporate management in accordance with their fiduciary obligations. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49, 105 S.Ct. 1986, 1990–91, 85 L.Ed.2d 372 (1985) ("Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.").

█ The ethical duties imposed by Canon 4, however, are broader than the attorney-client evidentiary privilege. *See, e.g., Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 172 (5th Cir. 1979). Canon 4 mandates that a lawyer "preserve the confidences and secrets of a client."[6] Most of the case law analyzing Canon 4 focuses on the disqualification of counsel, a mooted issue in the present case since Bowditch & Dewey has withdrawn its appearance. Nevertheless, the defendants seek an order either dismissing the complaint or prohibiting Bowditch & Dewey from discussing and disseminating its work product with substitute counsel. Stuart and Anderson make general allegations that throughout the course of the Peak litigation they revealed privileged informa-

tion, confidential communications and client secrets regarding their operation of Beacon to Bowditch & Dewey, Beacon's corporate counsel. Conversely, attorneys for Bowditch & Dewey attest in affidavits that "[n]o information received from Stuart or Anderson in either Peak I or Peak II was ever used in the preparation of the Complaint in this litigation, or for any other purpose in this litigation."[7]

Although the First Circuit has adopted the "substantial relationship" test for the disqualification of attorneys, *see Kevlik v. Goldstein*, 724 F.2d 844, 850–51 (1st Cir. 1984), it has not addressed the issues of access to the work product of either disqualified or withdrawn counsel. The questions of (1) attorney disqualification and (2) the subsequent work product turnover to substitute counsel are separate and distinct. *See First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 584 F.2d 201, 208 (7th Cir.1978). While the issue appears to be uncharted within the First Circuit, this court relies upon substantial precedent from other jurisdictions to fashion a protective order which allows the turnover of Bowditch & Dewey's work product to successor counsel.

In *First Wisconsin*, the Seventh Circuit en banc rejected a per se rule that the work product of a disqualified law firm is automatically "tainted" and, therefore, inaccessible to substitute counsel. *Id.* at 208. Advocating instead a case-by-case analysis, the *First Wisconsin* court held that the facts of that case merited the turnover of disqualified counsel's work product. *Id.* at 211. Both the Third and Tenth Circuits have upheld similar results. In *International Business Machines*, 579 F.2d at 283, the Third Circuit held that the district court properly exercised its discretion by disqualifying the plaintiff's law firm, granting the turnover of past work product to successor counsel and allowing consultation with re-

6. Canon 5 prohibits multiple client representation if it would impede the exercise of a lawyer's independent professional judgment on behalf of a client or require an attorney to represent differing interests; Canon 9 admonishes that a lawyer should avoid even the appearance of professional impropriety.

7. *See* Affidavit of Michael P. Angelini, Jan. 10, 1990 at 3; Affidavit of Louis M. Ciavarra, Jan. 10, 1990 at 3.

spect thereto between the plaintiff's former and current counsel for a period of sixty days. The Tenth Circuit has also affirmed the turnover of work product to substitute counsel, even when there was an allegation on the record that confidential communications may have been revealed to the disqualified attorney. *See Equal Employment Opportunity Comm'n v. Orson H. Gygi Co., Inc.*, 749 F.2d 620, 621–22 (10th Cir.1984). In that Title VII sex discrimination case, the trial judge disqualified the defendant's lawyer who was concurrently representing in a separate annulment action one of the claimants on whose behalf the EEOC was bringing suit. Despite an allegation in the claimant's affidavit that she had divulged confidences to the disqualified attorney which might be used against her in the present lawsuit, the Tenth Circuit approved the district court's order granting the defendant's new counsel access to all of the disqualified attorney's relevant work product. *Id.* at 621–22.

Only one reported federal case addresses the exact issue here: the turnover of the work product of a *withdrawing* law firm to a client's substitute counsel. *See Behunin v. Dow Chemical Co.*, 642 F.Supp. 870 (D.Colo.1986). Without holding an "in camera" inspection, the *Behunin* trial judge ordered the turnover of all work product completed by a law firm withdrawing its appearance to the client's successor counsel. The plaintiff's withdrawing lawyers had represented the defendant chemical company in five prior and different corporate lawsuits. The court applied a balancing test to hold that the harm to the plaintiff if denied access to its former attorneys' work product outweighed the harm to the defendant, the "former" client, upon the turnover of such material. *Id.* at 873.

Another district court case, involving party relationships similar to the present claim, allowed the corporation plaintiff and its successor counsel access to the work product of the plaintiff's disqualified attorneys. *See E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 400–01 (S.D.Tex.1969). In *E.F. Hutton*, the court denied the defendant's requested injunctive relief to prohib-

it the dissemination of the work product produced by the plaintiff's disqualified law firm that had jointly represented both the plaintiff corporation and the defendant corporate officer. *Id.* at 400–01. *Cf. Realco Services, Inc. v. Holt*, 479 F.Supp. 867, 880 (E.D.Pa.1979) (withholding decision on work product turnover issue yet granting substitute counsel access to all filed documents, discovery material, contract copies and other relevant public documents, correspondence between and among counsel and court, and summaries prepared by either the plaintiff's witnesses or expert witnesses); *but see EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1463 (Fed.Cir.1984) (ordering that the post-disqualification work product of the plaintiff's attorneys be withheld from successor counsel where two partners from the plaintiff's law firm, who had been exposed to confidential communications, switched employment to the defendant's law firm mid-litigation).

■ The information that Stuart and Anderson as Beacon employees communicated to Bowditch & Dewey, their corporate counsel, is not protected by the attorney-client privilege. *See Weintraub*, 471 U.S. at 348–49, 105 S.Ct. at 1990–91; *E.F. Hutton*, 305 F.Supp. at 400–01. While the professional ethical duties of counsel are broader than the attorney-client evidentiary privilege, *see Brennan's Restaurants*, 590 F.2d 172, Bowditch & Dewey have substantially mitigated the appearance of ethical impropriety by withdrawing as counsel for the plaintiff. Having considered the relationship of Bowditch & Dewey with the defendants in the context of the Peak litigation, this court is satisfied that the protective boundaries of both the attorney-client privilege and the professional attorney ethical standards permit the turnover of Bowditch & Dewey's work product to the plaintiff's substitute counsel.

In accordance with Canon 4 and its corresponding Disciplinary Rule 4–101, Bowditch & Dewey shall continue to preserve any confidential communications, privileged information or client secrets in the turnover of its relevant work product to Chronicle's successor counsel. This work prod-

uct turnover, and communications between the plaintiff's former and current attorneys with respect thereto, shall occur within a sixty day period from the effective date of this order. Aside from this transaction, Bowditch & Dewey shall refrain from assisting Chronicle's new counsel in the preparation of this case.[8]

### III.

As noted above, *infra* p. 272, the defendants' motions to disqualify the plaintiff's law firm became moot when this court granted Bowditch & Dewey's request to withdraw its appearance on February 21, 1990. In accordance with this order, the defendants' motions for injunctive relief prohibiting the discussion or dissemination of Bowditch & Dewey's work product are denied.

Having held that the turnover of Bowditch & Dewey's work product to substitute counsel is allowed, the defendants' motions to dismiss the complaint are summarily denied,[9] and the stay of discovery pending resolution of defendants' motions is removed.

SO ORDERED.

---

**8.** The defendants remain free to protect their interests should this issue of multiple representation and client confidentiality arise in other contexts. For example, this court has been informed that the law firm currently representing defendant Anderson has previously represented defendants Stuart and James P. Hantzis, creating a possible conflict issue should cross-claims be raised among the defendants.

**9.** The court notes that the two principal cases the defendants referenced in support of dismissing the complaint involved substantially different underlying facts with more egregious ethical violations and are not controlling here. *See Doe v. A. Corp.*, 330 F.Supp. 1352 (S.D.N.Y.

1971), *aff'd sub nom., Hall v. A. Corp.*, 453 F.2d 1375 (2nd Cir.1972) (where the plaintiff's attorney purchased one share of the defendant's stock two weeks before leaving the employment of the defendant's law firm in order to initiate a shareholder's derivative suit based solely upon the information he had acquired while doing legal work for the defendant); *Slater v. Rimar, Inc.*, 462 Pa. 138, 338 A.2d 584 (1975) (where the plaintiff's lawyer had been an officer and director, as well as corporate counsel, for the defendant companies and derived the entirety of the plaintiff's complaint in a shareholder derivative action upon information he had gathered as the defendants' attorney).