**REALCO SERVICES, INC., et al.**

v.

**Thomas J. HOLT et al.**

**Civ. A. No. 77–4097.**

United States District Court,
E. D. Pennsylvania.

**May 30, 1979.**

---

See also D.C., 479 F.Supp. 880.

John T. Ward, Ober, Grimes & Shriver, Baltimore, Md., Andrew C. Hecker, Jr., Hecker & Maginnis, Philadelphia, Pa., for plaintiffs.

Arnold Levin, Michael Fishbein, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for defendants.

MEMORANDUM AND ORDER

NEWCOMER, District Judge.

The defendants have moved to disqualify plaintiffs' counsel from further representation of the plaintiffs in this action, on the grounds that the plaintiffs' counsel are in a position to use information acquired in their earlier representation of certain of the defendants to the disadvantage of those defendants. For the reasons that follow, dis-

qualification of the plaintiffs' principal counsel will be required, but local counsel will be permitted to remain in the case.

This action is a large commercial suit by seven[1] named corporate plaintiffs against fourteen individual and corporate defendants. The case arose out of an alleged breach of contract. The plaintiffs are lessors of seagoing cargo containers, which are used in containerized freight shipping. Marine Transport Service (M.T.S.), a named defendant, is alleged to have leased a number of these containers from the plaintiffs. It is further alleged that M.T.S. failed to pay the agreed rental; that it lost or failed to return many of the containers; and that it returned others in a damaged condition. Altogether, the plaintiffs seek $2,019,407.79 and an award of punitive damages.

The presence in this suit of defendants other than M.T.S. is based on allegations that, broadly speaking, M.T.S. was seriously undercapitalized, had no genuine separate corporate existence, and served merely as a conduit for the personal business dealings of Thomas J. Holt and certain named associates. The corporate defendants named in the Third Amended Complaint are all allegedly owned or controlled, in whole or in part, by Thomas Holt himself or by other Holt companies, and are likewise alleged to have no genuine separate corporate existence. The plaintiffs claim that the Holt interests are a single entity that has been established to conduct foreign and interstate transportation of goods solely or primarily for Holt's personal benefit. The plaintiffs seek to recover the alleged debt of M.T.S. from Holt himself, from the other individual defendants, and from any or all of the named corporate defendants.

The plaintiffs are represented by the Baltimore, Maryland, firm of Ober, Grimes and Shriver. Mr. Kieron Quinn is lead counsel in the case for that firm. Ober, Grimes and Shriver has retained the Philadelphia firm of Hecker and Maginnis as local counsel in the case, as required by Rule 10 of the Local Rules of Civil Procedure of the Eastern District of Pennsylvania.[2]

Sometime on or before September 26, 1978 counsel for the defendants learned that Ober, Grimes and Shriver, through Geoffrey Tobias, Esquire, had at one time represented certain of the present defendants, including Worldwide Marine Trading Corporation (Worldwide). The instant motion to disqualify plaintiffs' counsel followed.

Worldwide was the charterer of the vessel M/V FINN BUILDER which had reportedly grounded while docking at the "Holt Marine Terminal" in Gloucester City, New Jersey, on October 21, 1976. Mr. Tobias was retained to represent Worldwide's interests in any disputes that arose out of the incident. At about the same time that he began his representation of Worldwide, Mr. Tobias agreed to represent the terminal also, an entity he knew as "Thomas Holt Terminals, Inc."[3] Mr. Tobias later learned that the ship might have caused damage to the pier during docking.

Mr. Tobias's representation of both clients continued until July 6, 1977, when he

---

1. There were seven plaintiffs and fourteen defendants named on the Third Amended Complaint, filed on August 24, 1978.

2. The Philadelphia firm of LaBrum and Doak was originally retained as local counsel in the action. During the pendency of this motion, Andrew C. Hecker, Jr., the attorney chiefly responsible for the case within LaBrum and Doak, left that firm to join the firm of Maginnis and Hecker. LaBrum and Doak has withdrawn its appearance, and Maginnis and Hecker, by Mr. Hecker, has entered an appearance. The Court has treated the defendants' motion to disqualify LaBrum and Doak as a motion to disqualify Maginnis and Hecker.

3. The defendants have stated that the Gloucester City terminal, Pier 8, was owned by Holt Hauling and Warehousing Systems, Inc. and operated by Holt Marine Terminal, Inc. (Defendant's Motion for Disqualification of Plaintiffs' Counsel, ¶ 3). Both those entities are defendants in this suit. The plaintiffs' counsel argue that Mr. Tobias represented "Thomas Holt Terminals, Inc." For purposes of this motion, the Court will usually refer to the terminal as a single entity (e. g. the "dockowner"), but finds as a fact that Mr. Tobias represented both of the corporations asserted by the defendants to have been the owner and operator of the pier. (Affidavit of Arnold Levin, Esquire, ¶ 5)

formally terminated his representation, although it appears that the working relationship between lawyer and clients broke down much sooner than that. (Affidavit of Geoffrey Tobias ¶ 13–¶ 16).

The complaint in the instant action was filed on November 30, 1977.

## ETHICAL STANDARDS

The basic ethical principle that the defendants allege to have been violated is Canon 4 of the Code of Professional Responsibility: "A lawyer should preserve the confidences and secrets of a client."

By Local Rule, the Code of Professional Responsibility has been adopted as the standard of conduct for attorneys practicing before this Court. Rule 11, Local Rules of Civil Procedure.

Disqualification from continued representation is a prophylactic measure that courts have invoked in appropriate circumstances to prevent improper disclosure of clients' confidences, or to ameliorate the effects of such disclosures where they have occurred:

"Canon 4 of the Code of Professional Responsibility imposes upon an attorney an obligation to preserve the confidences and secrets of one who has employed him and extends this obligation beyond termination of the employment. Indeed, an attorney is prohibited from accepting a subsequent representation where there 'may be the appearance of a possible violation of confidences' even though this may not be true in fact. ABA Committee on Professional Ethics, Informal Opinion No. 885 (1965). Courts have enforced these precepts by requiring disqualification of counsel where it appears that the subject matter of a pending suit in which the attorney represents an interest adverse to a prior employer is such that during the course of the former representation the attorney 'might have acquired substantially related material.' *Richardson v. Hamilton Int'l Corp.* 469 F.2d [1382] at 1385 (3d Cir. 1972); *T. C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265 (S.D.N.Y.1953). . . . ."

*American Roller Company v. Budinger,* 513 F.2d 982, 984 (3d Cir. 1975).

■ If an attorney is prohibited by the Code from representing a particular client in a particular action, all the members of his law firm are similarly disqualified. DR 5–105(D); *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125, 1128 (5th Cir. 1971). If Mr. Tobias acquired any "substantially related material" in the prior matter, and is ethically prohibited from serving as counsel to the plaintiffs in this case, Ober, Grimes and Shriver must be disqualified as a firm.

■ The "substantial relationship" standard must be used, as *Budinger, supra,* indicates, to test the likelihood that certain "material" in the former and present actions is substantially similar. There is no requirement that the former and present suits involve similar causes of action; the two cases may be entirely dissimilar. However, the Court must attempt to prevent confidential information that might have been gained in the first representation from being used to the detriment of the former client in the subsequent action.

■ If the client in the prior representation might have imparted confidential information to his lawyer to aid the lawyer in dealing with particular issues, and if issues arise in the second suit which would permit the use of such confidences *against* the original client, the substantial relationship test is met, and disqualification is required.

This Court should make clear, however, what it means when it applies the "might have acquired" standard set forth in *Budinger, supra.* "Might" is a very broad word, and were it applied liberally, virtually any prior representation of a current adversary could serve as grounds for disqualification. Lawyers and clients talk to each other, and they "might" talk about almost anything, especially when it is understood that the communications are confidential.

■ This Court reads the "might have acquired" part of the test in *Budinger* somewhat more narrowly: The lawyer "might have acquired" the information in

issue if (a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such a character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship.

Ober, Grimes and Shriver argues vigorously that it did not acquire *any* confidential information from its former clients that is of use to the plaintiffs in the instant suit. The Court can assume that that representation is truthful, accurate and made in good faith. The issue framed by Ober, Grimes and Shriver's argument is whether a showing of actual disclosure of confidences is necessary, or whether a standard based on potential disclosure is more appropriate.

In the narrow area of protection of confidences, an analysis restricted to legal (as opposed to actual) prejudice is essential:

"The [substantial relationship] rule does not necessarily involve any inquiry into the imponderables involved in the degree of relationships between the two matters but instead involves a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other. The effect of the Canons is necessarily to restrict the inquiry to the possibility of disclosure; it is not appropriate for the court to inquire into whether actual confidences were disclosed [footnote omitted]".

*Westinghouse Electric Corp. v. Gulf Oil Corp.*, 1978–2 Trade Cases, ¶ 62,372.

Were actual prejudice the determining factor, a party's attempts to protect its confidences would necessarily cause further disclosure. If a court were required to investigate whether particular confidences passed between the former client and the lawyer, some sort of evidentiary development would be essential. The client's confidences (or at the very least a discussion of those confidences in the briefs and arguments of the parties) would end up on the public record—and perhaps on the pages of the Federal Supplement—as a by-product of the effort to keep them from being divulged. That kind of Hobson's Choice is not one to which the legal profession ought to submit its clients.[4]

## THE PRIOR REPRESENTATION

To determine whether the prior representation bears a substantial relationship to the instant representation, it is necessary to examine the facts, circumstances and legal issues that faced Mr. Tobias when he was retained to represent Worldwide Marine Trading Corporation in October of 1976.[5]

Mr. Tobias was retained by Worldwide through its agent, George Bakalakis, in October of 1976 to represent its interests against the owners of the M/V FINN BUILDER, which was then under charter to Worldwide. Mr. Tobias was informed

4. Although this Court must apply a legal prejudice test, it cannot accept another standard proffered by the defendants—that "doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification." *International Business Machines Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978), citing *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) and *Chugach Elec. Ass'n v. United States District Court*, 370 F.2d 441, 444 (9th Cir. 1967). (It is not clear from the context whether the Third Circuit has adopted the quoted language). The difficulty with such a standard is the danger that it will serve as a substitute for analysis rather than as a guide to it. It is easier to find a "doubt" than to resolve difficult questions of law and ethics. The disruption and prejudice that befall a client whose counsel is disqualified are reasons to avoid a hasty conclusion in favor of disqualification, based merely on a "doubt" about the propriety of the representation.

5. For purposes of this motion, the Court has accepted certain representations in the plaintiffs' briefs as true, as well as the facts set forth in the affidavit of Geoffrey S. Tobias, Esquire. Except for the assertion discussed *supra,* that the Holt Marine Terminal in Gloucester City comprises two corporations, the movant has not offered any evidence which is material to the Court's holding. Both sides have submitted, *in camera,* confidential material from their files, such as the correspondence files that reflect the prior representation. The material has not been relied on by the Court in any respect, but it will be docketed and ordered sealed so that it will be available for appellate review.

that the FINN BUILDER had grounded while docking at Pier 8 in Gloucester City, New Jersey, on the Delaware River near Philadelphia. The ship reportedly sustained a damaged rudder in the incident, and it was sent to a Baltimore drydock for repairs. Mr. Tobias began his investigation of the incident within a few days after being retained.

On December 21, 1976, Mr. Tobias met with Mr. Holt to discuss the case. At that time Mr. Holt informed him that the FINN BUILDER had apparently allided with Pier 8, causing some damage to the pier. Mr. Tobias had already been retained to represent the dockowner, a Holt entity, when he learned about the damage to the pier.

The December 21, 1976, date is important because it was a point at which Mr. Tobias was clearly representing both the charterer and the dockowner, and had had an opportunity to talk with his clients about the facts of the case.

Mr. Tobias was responsible for "providing [Worldwide] a legal opinion on the effect of the safe berth clause in the charter party" (Tobias Affidavit ¶ 8). He was faced with a situation in which the owners of the FINN BUILDER were in a position to sue Worldwide for damage to the vessel caused by the grounding, while the dockowner had a potential claim against the shipowners for damage to the pier.

The safe berth clause in the charter party between Worldwide and the owners of the FINN BUILDER read in pertinent part as follows:

"The Vessel to be employed in lawful trades for the carriage of lawful merchandise only between good and safe ports or places where she can safely lie always afloat . . ."

The safe berth clause quoted above is typical of the safe berth clauses found in most charter parties. Safe berth clauses are often the subject of litigation because they are placed in issue virtually every time a ship is damaged at or near a berth.

There are two views as to the effect of a safe berth clause. The "warranty", or con-

tractual view makes the charterer the guarantor of the safety of any berth at which the ship docks, and imposes liability upon the charterer for any damage to the ship caused by an unsafe berth. The warranty interpretation of the clause is favored in the Second Circuit. *Park S. S. Co. v. Cities Service Oil Co.,* 188 F.2d 804 (2d Cir. 1951); *Cities Service Transportation Co. v. Gulf Oil and Refining Co.,* 79 F.2d 521 (2d Cir. 1935).

Other authorities view the clause merely as the owner's protection against being held responsible for any economic loss resulting from any delay caused by the master's refusal to take the ship into a berth he considers unsafe. If damage to the ship does occur during docking, the shipowner, generally speaking, ought to bear the loss:

"It is quite inconsonant with the positions of the parties, in the usual case, to charge the charterer with the consequence of the master's having entered an unsafe port or tied up at an unsafe berth. It is the master who ordinarily has the best means of judging the safety of a port or berth, first because he is an expert in navigation, furnished with aids thereto, secondly because he knows his vessel (including its draft and its present trim), and thirdly because he is on the spot. The charterer, on the other hand, need not be a nautical expert at all. . . . [H]is designation of port and berth are made (and are known to be made) on commercial rather than on nautical grounds.

[I]t is by no means necessary that [the clauses] be given the . . . meaning of creating an affirmative liability of charterer to ship, in case of mishap."

Gilmore and Black, The Law of Admiralty, 2d Ed., 1975, pp. 204–5; *National Marine Service, Inc. v. Gulf Oil Co.,* 433 F.Supp. 913, 917–18 (E.D.La.1977).

As counsel for the charterer in a case that threatened to proceed to litigation, Mr. Tobias was responsible for framing a defense to the shipowner's possible claim for damage to the vessel. Research would have revealed the split of authority on the legal effect of the safe berth clause, and Mr. Tobias would naturally have sought to rely on the Gilmore and Black view.

■ However, given the possibility that a court would follow the Second Circuit view on the safe berth issue, holding Worldwide liable on a warranty theory, Mr. Tobias would have had to have researched the possibility of recovering over against the dockowner. There is ample authority to support recovery against a wharfinger for breach of an implied duty to provide a safe berth:

> "It is well settled that a wharfinger is not the guarantor of the safety of a ship coming to his wharf. He is, however, under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner. [citations omitted]"

*Trade Banner Line, Inc. v. Caribbean Steamship Co., S. A.,* 521 F.2d 229, 230 (5th Cir. 1975). A wharfinger is required to be aware of the depth of his berth and to warn ships of the danger of grounding where the ship's draft exceeds the depth of the berth. See *Bouchard Transportation Co. Inc. v. Tug Gillen Brothers,* 389 F.Supp. 77, 82–3 (S.D.N.Y.1975).

With suit against Worldwide by the shipowners a distinct possibility (based on a breach of the safe berth clause), it was Mr. Tobias's duty to investigate, on behalf of the charterer, the possibility of impleading the dockowner for contribution or indemnity for its failure to maintain a safe berth. Cf. *Venore Transportation Co. v. Oswego Shipping Corp.,* 498 F.2d 469 (2d Cir. 1974); *The Mascot,* 28 F.Supp. 770 (D.N.J.1939); *The John Caroll,* 275 F.2d 302 (2d Cir. 1921).

Mr. Tobias's duty to investigate recovery over against the dockowner was not changed by the possibility that the claims between Worldwide and the shipowners would have to be taken to arbitration. Clause 23 of the charter party required "Any dispute arising under the Charter to be referred to arbitration in London (or such other place as may be agreed), and English Law to apply . . ." If the dispute had been carried to arbitration, rather than to court, Worldwide would still have had a basis for an independent action against the dockowner for contribution or indemnity. An adverse arbitrator's award would have been a binding legal obligation, incurred arguably because of the negligence of the dockowner, giving rise to a right of action in Worldwide for contribution. See, e. g., *Zontelli Brothers v. Northern Pacific Railway Co.,* 263 F.2d 194, 199 (8th Cir. 1959).

The dockowner also had an interest in ascribing blame for the grounding and the allision to the faulty navigation of the master, an agent of the owner. See *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790 (5th Cir. 1977). However, that similarity of interest did not obscure the charterer's independent interest in investigating recovery over against the dockowner.

Mr. Tobias had been "requested to undertake . . . representation of multiple clients having potentially differing interests" EC 5–15. He could have continued to represent both Worldwide and the dockowner only if "it [were] obvious that he [could] adequately represent the interest of each and if each [had] consent[ed] to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." DR 5–105(C). Moreover, the clients were both corporations, to which a special duty of fidelity to the entities themselves applies:

> "A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. . . ." EC 5–18.

■ A practitioner also has a duty actively to seek out possible conflicts of interest:

"The rule against representing conflicting interests must of necessity be a rule of general application for the ignorant as well as the sophisticated. And the rule requires counsel—not clients—to search out and disclose potential conflicts between clients and the facts which cause them to arise.

The obligation to search out and disclose potential conflicts is placed on the attorney in order to put the client in a position to protect himself by retaining substitute counsel if he so desires. . . Once apprised of the facts, counsel incur the responsibility of applying the law to the facts and advising their clients of any legal ramifications." [footnotes omitted] *E. F. Hutton & Company v. Brown,* 305 F.Supp. 371, 398 (S.D.Tex.1969).

■ Mr. Tobias could have avoided the conflict of interest problem that he faced only if it appeared, from his discussions with his clients, that one of two facts were true: (1) the interests of the two corporations were not actually (as opposed to legally) divergent (See *Brown & Williamson Tobacco Corp. v. Daniel International Corp.,* 563 F.2d 671 (5th Cir. 1977); or (2) the corporations could and did give an informed consent to the dual representation.

The case facing Mr. Tobias was not one in which consent to multiple representation would have been effective. Although no pleadings had been filed in the FINN BUILDER matter while Mr. Tobias was counsel for the Holt companies, there was a "grounding dispute between the charterer and the shipowner" (Tobias Affidavit ¶ 12), and the terminal put the shipowners "on notice of the terminal's claim for damage to

the berth." (*Id.,* ¶ 11). EC 5–15 explicitly says that "A lawyer should *never* represent in litigation multiple clients with differing interests." (Emphasis supplied). DR 5–105(C) says that a lawyer may represent multiple clients, *with* their consent, "if it is obvious that he can adequately represent the interest of each." Worldwide and the terminal could not have consented to multiple representation because it was not at all "obvious" that Mr. Tobias could have continued adequately to represent both interests, even in settlement discussions.[6] To vindicate one interest, he was dutybound to investigate harming the other.[7]

Mr. Tobias could also have continued the representation of both Worldwide and the terminal if he were able to satisfy himself that the corporations' interests were not *actually* divergent. *Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp., supra.,* held that sister corporations could forego collection of claims against each other, thereby permitting their representation by a single lawyer, at least in a situation where "a legal victory for [one corporation] would be a defeat for its own stockholders if the judgment were obtained at [the other's] expense." 563 F.2d at 674.

Mr. Tobias had an obligation to determine whether the two clients that he had begun to represent had no (or perhaps few) divergent interests. It is necessary, for purposes of the instant motion, retrospectively to examine what inquiries Mr. Tobias might or should have made to satisfy himself that the representation of both Holt interests was proper. EC 5–18 made his task very difficult, for, as discussed above, he could not ethically have rested on assurances from the majority stockholder (presumably Mr. Holt) that multiple representa-

---

**6.** Worldwide's settlement posture (as a separate corporate entity) could have depended to a large extent on whether it was potentially entitled to recover over against the dockowner for any amount paid.

**7.** EC 5–15 is unfortunately drafted in one respect. It prohibits representation of conflicting interests in litigation, while permitting, under

certain circumstances, representation of potentially conflicting interests in matters "not involving litigation." It does not, however, attempt to define a lawyer's duty where there is an actual or potential conflict in "contemplated litigation", a term that the Code drafters found appropriate to use in slightly different contexts. See, e. g., DR 5–101; DR 5–102; DR 5–103.

tion was acceptable.[8] Rather, he should have determined, at the very least, that effective control of the companies rested in the same hands. If Mr. Holt controlled both corporations, consent would not have been necessary, assuming *Brown & Williamson, supra,* accurately states the law. If he did not, the twin problems of divergent interests and ineffective consent strongly militated against the dual representation.

## SUBSTANTIAL RELATIONSHIP

■ In the instant action, the plaintiffs have alleged, in part (Third Amended Complaint):

"97. The entities set out in Paragraph 59 [including Worldwide, Holt Marine Terminal, Inc., and Holt Hauling and Warehousing Systems, Inc.] were formed and are now owned and/or controlled in whole or in part by defendant Thomas J. Holt. Together with MTS, they constitute an enterprise entity which conducts or conducted the business of foreign and interstate transportation by land and sea.

98. MTS, as one such entity, existed, was owned by, and was operated only as an instrumentality of the larger enterprise, and its affairs were so intermingled with the operations of the larger enterprise as to cause MTS to lose its own identity. Thus, the acts of each individual entity in the larger enterprise, including MTS, were also the acts of the complete enterprise entity. The assets of each individual entity were treated by defendants as, and were in fact, the assets of the enterprise entity."

The allegations quoted above can be presumed to have been made, pursuant to Rule 11, F.R.Civ.P., with "good ground to support [them]", to the best of counsel's "knowledge, information and belief".

*Assuming* that the Holt enterprises are conducted as a single entity, with the acts of one serving as the acts of all, there is a realistic possibility that, in response to inquiries about possible conflict of interest, Thomas Holt told his lawyer, Geoffrey Tobias, on December 21, 1976, in substance, "You don't need to worry about conflict of interest—these corporations are separate on paper only, and the interests can't conflict. These companies were all formed to forward the same interests—mine." That realistic possibility, in itself, compels the disqualification of Ober, Grimes and Shriver from this action.

The possibility that Mr. Tobias might have acquired some of the same information alleged in the complaint becomes even more striking when the role of M.T.S. is considered. M.T.S. subchartered the FINN BUILDER from Worldwide, and that subcharter party was in effect on the date of the grounding. The subcharterer was an even more likely target for recovery over than was the dockowner, because it was likely that the subcharter party between M.T.S. and Worldwide contained a safe berth clause drafted in favor of Worldwide. Cf. *Venore Transportation Co. v. Oswego Shipping Corp., supra; Paragon Oil Co. v. Republic Tankers, S. A.,* 310 F.2d 169 (2d Cir. 1962).[9]

It is inconceivable that Mr. Tobias was not aware that M.T.S. was one of the Holt companies. He was likely to have acquired that information virtually at the inception of his representation of Worldwide, upon

---

**8.** Reasonable minds could certainly differ about the Court's conclusion, expressed above, that consent would not have been effective in the situation that Mr. Tobias faced. However, even if consent *might* have been effective, it is not at all clear that it *would* have been. Certainly the difficulties with relying on consent were serious enough that Mr. Tobias should also have tried to establish that his clients' interests were identical. Since he ought to have tried to satisfy himself of an identity of interests, the Court must assume, for purposes of this motion, that he had discussions with his clients directed toward that purpose.

**9.** It does not appear that Mr. Tobias ever received a copy of the subcharter party between M.T.S. and Worldwide. (Plaintiffs' Answer to Defendants' Motion to Disqualify Counsel, ¶ 2). The Court believes that, at least until he was informed differently, Mr. Tobias, or any admiralty lawyer, would have worked under the assumption that there was a safe berth clause included in the subcharter party.

inquiring of Worldwide about the identity of the subcharterer.

The instant complaint is centered, in a sense, on M.T.S. It was M.T.S. that allegedly breached the contracts in issue. The other Holt companies are allegedly liable to the plaintiffs on various "single entity" theories, and M.T.S., for purposes of this case, is at the hub of the wheel that encompasses all the corporations.

Had Mr. Tobias suggested to his client the possibility of recovery over against M.T.S. on the subcharter party, there is every reason to expect that the client would have revealed the information contained in Paragraph 98, i. e., that the assets of Worldwide were the assets of M.T.S. Furthermore, if M.T.S. were indeed undercapitalized, as alleged in Paragraph 75 of the Complaint, Mr. Holt could well have related that fact to his counsel upon counsel's suggestion that M.T.S. was a possible target for recovery over.

Mr. Tobias had other reasons to be concerned about the relationship between Worldwide and the dockowner. Had the owners of the FINN BUILDER brought suit against either Worldwide or the dockowner, they might well have made allegations similar to those made in this case, e. g. that all Holt corporations should be answerable for the debts of all other Holt corporations. Given the frequency with which plaintiffs seek to "pierce the corporate veil" to ensure access to a deep pocket, Mr. Tobias could well have expected such an allegation, and would of course have been obliged to investigate the relationship among the companies to be able to defend against it.

Even if the corporations were treated by a court as separate entities, there was a threat that the owners of the FINN BUILDER would seek to hold Worldwide accountable on an agency theory for the negligence of the dockowner in failing to provide a safe berth. See *Venore Transportation Co. v. Oswego Shipping Corp., supra,* 498 F.2d at 472–3. Furthermore, under the Gilmore and Black view of the safe berth clause, the charterer's knowledge of the condition of the berth is crucial in determining whether it should be held liable for damage to the ship:

"In the usual case of entry into an unsafe port or berth . . . the entry is effected by decision of the master. . . Very clear language, or compelling special circumstances, ought to be required, before the liability is shifted to the charterer . . .

Special circumstances vary from case. . . . It is possible, and fairly likely that the charterer or consignee may have knowledge of the conditions at a given *berth* which make it unsafe, while the master will neither have, nor reasonably be charged with having, such knowledge. In such cases, it may well be that the charterer or consignee ought to be held liable, not because of the "safe port" or "safe berth" clauses, but because it ought to be held to be an actionable wrong for him to invite the ship without warning into a peril known to him with or without clauses. There may be cases, too, where the charterer . . . is so situated as reasonably to be charged with a duty of inquiry particularly as to berth." (emphasis in original).

Gilmore and Black, The Law of Admiralty, 2d Ed., p. 205. The shipowners could well have sought to hold Worldwide liable on the basis of fault, as well as warranty, because of the knowledge (actual or imputed) that Worldwide gained from its relationship with the dockowner. Mr. Tobias needed to have a clear understanding of the operating relationship between the companies to be able to meet such an argument. The operating relationship among the Holt companies is specifically placed in issue in Paragraph 98 of the complaint.

The Court must hold that Mr. Tobias "might have acquired" (as that phrase is construed herein), in the prior representation, material substantially related to the issues in the instant action. *American Roller Company v. Budinger, supra.*

This opinion treats at some length the factual inquiries that Mr. Tobias might or ought to have made in the course of the prior representation, given the existence of

particular legal issues. However, the situation that he faced, as it involved the relationship among the Holt companies, is also susceptible to a broader examination. Mr. Tobias represented three Holt companies in a matter that could well have proceeded to litigation. Countless separate legal and factual issues involving the relationship among those corporations and their shareholders could have arisen which defy any retrospective attempt to reconstruct them. EC 4–1, however, imposes upon an attorney an affirmative obligation to explore a variety of issues and facts with his client:

"A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant. . ."

Irrespective of the precise legal issues involved in the FINN BUILDER docking incident, the Court believes that Mr. Tobias would not have been doing his job of anticipating the unanticipated had he not inquired, to some reasonable extent, into the relationship between Worldwide and the dockowner. In responding to those inquiries, Mr. Holt, in "discuss[ing] whatever he wishe[d] with his lawyer" (EC 4–1), could have imparted virtually any of the facts alleged in the instant complaint.

The Court need not decide whether Mr. Tobias's duty to make general inquiries into the interrelationship among the Holt companies—for purposes of anticipating the unanticipated—in itself justifies a conclusion that he gained substantially related material in the prior representation. Disqualification in this case is not based on a single, or even a string of legal technicalities. On the contrary, for all of the reasons noted above, the possibility that Mr. Tobias learned substantially related facts is real and unmistakable.

## LOCAL COUNSEL

The defendants' motion to disqualify MaGinnis and Hecker necessarily stands on a different footing from the motion to disqualify principal counsel. MaGinnis and Hecker, it must be emphasized, have never represented any of the defendants. If disqualification of local counsel is required, it is required either by an extension of the prophylactic rule that has been invoked against Ober, Grimes and Shriver to prevent disclosure of confidences, or it is required by Canon 9 of the Code: "A lawyer should avoid even the appearance of impropriety."

Rule 10 of the Local Rules of Civil Procedure for the Eastern District of Pennsylvania requires any attorney who is not a member of the bar of this Court to have as associate counsel of record an attorney who is a member of the bar of this Court. Andrew Hecker was retained by Ober, Grimes and Shriver to satisfy the requirements of Local Rule 10.

The defendants' argument for disqualification of Hecker and MaGinnis rests on an intricate chain of possibilities. Thomas Holt or one of the employees of a Holt company might have told Geoffrey Tobias information that might have been useful to the plaintiff in this suit. Mr. Tobias might have relayed some of that information to Mr. Quinn. Mr. Hecker might have received some of the information from Mr. Quinn (perhaps without realizing that he had), which he might now use to the detriment of the defendants. Obviously at some point the chain of possibilities bears little likely resemblance to reality:

"Carriage of this imputation-on-an-imputation to its logical terminus could lead to extreme results in no way required to maintain public confidence in the bar."

*American Can Company v. Citrus Feed Co.,* 436 F.2d 1125, 1129 (5th Cir. 1971).

■ Where an attorney who has not previously represented a currently adverse interest is sought to be disqualified, a "careful sifting of the facts and circumstances"

is required to determine whether disqualification is proper. *Akerly v. Red Barn System, Inc.*, 551 F.2d 539, 543 (3d Cir. 1977). Because a court can investigate the working relationship between co-counsel without a serious risk of disclosure of a client's confidences, there is greater reason to require a reasonable likelihood of actual prejudice to the defendants' confidentiality interests before disqualification of local counsel should be ordered.

■ Mr. Hecker has filed a simple, essentially unrebutted affidavit setting forth the facts of his role as local counsel in this case. The affidavit is set forth in its entirety in the margin.[10] The defendants appar-ently dispute paragraph 12 of the affidavit (Defendants' Reply Memorandum of Law at 11), but they submitted no evidence at hearing to show that Mr. Hecker has reviewed any documents that are in the possession of Ober, Grimes and Shriver. The Court finds Mr. Hecker's sworn representations entirely credible, and adopts those representations as findings of fact.[11]

Mr. Hecker has not been privy to any confidences of Worldwide, Holt Marine Terminal or Holt Hauling and Warehousing. Neither protection of those companies' confidences nor vindication of public confidence in the bar requires his disqualification

---

10. Mr. Hecker's affidavit reads as follows:

*AFFIDAVIT*

ANDREW C. HECKER, JR., being duly sworn according to law, deposes and says:

1. That he is a member of the firm of LaBrum and Doak;

2. That, in behalf of said firm, he has been serving as local counsel for plaintiffs in the case of *Realco Services, Inc., et al. v. Thomas J. Holt, et al. v. MTS Agencies, Inc.*, now pending in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 77–4097 [479 F.Supp. 880]);

3. That LaBrum and Doak's role in the above-identified litigation has been one of filing pleadings, introducing Baltimore counsel to the Court and preparing discovery Motions, requiring a knowledge of discovery rules and the procedural history of the pending litigation, but not requiring knowledge of the peculiar substantive facts of the pending litigation;

4. That Ober, Grimes & Shriver prepared the Complaint and other substantive pleadings in the pending litigation;

5. That Ober, Grimes & Shriver has directed the handling of the pending litigation in plaintiff's behalf;

6. That LaBrum and Doak has acted in the pending litigation only upon the instructions of Ober, Grimes & Shriver;

7. That the present action, to the best of his knowledge, information and belief, represents the first case in which the firms of Ober, Grimes & Shriver and LaBrum and Doak have been associated;

8. That LaBrum and Doak did not have, prior to a telephone call from defendants' counsel on September 26, 1978, any information regarding prior representation by Ober, Grimes & Shriver of any defendant herein;

9. That LaBrum and Doak has never discussed with Ober, Grimes & Shriver, or any partner, associate or employee thereof, the substance of any prior representation by that firm of any defendant herein;

10. That he has not met or talked with Geoffrey Tobias, Esquire, at any time;

11. That LaBrum and Doak has no knowledge of the issues involved in any prior representation by Ober, Grimes & Shriver of any defendant herein;

12. That no representative of LaBrum and Doak has ever visited the offices of Ober, Grimes & Shriver in Baltimore or has ever reviewed whatever documents have been gathered by that firm in connection with the pending litigation;

13. That LaBrum and Doak has handled numerous prior actions against Thomas J. Holt and various corporate entities in which he has an interest or allegedly has an interest;

14. That, as a result of the litigation described in paragraph 13 above, LaBrum and Doak has developed a substantial body of knowledge regarding the existence of various Holt corporations and the relationships among them;

15. That LaBrum and Doak does not have and has not reviewed any files developed in connection with representation of Holt Hauling & Warehousing Systems, Inc.; Holt Marine Terminal, Inc. and Worldwide Marine Trading Corp. in a matter involving the grounding and/or collision of the M/V FINN BUILDER at or near Pier 8 in Gloucester City, New Jersey; and

16. That LaBrum and Doak has not, at any time, received or reviewed any confidential communications received by any party from Holt Marine Terminal, Inc.; Holt Hauling & Warehousing Systems, Inc. or Worldwide Marine Trading Corp., except as such communications may have been produced by defendants herein as a party of discovery in the pending litigation.

11. Mr. Hecker's sworn statement is also entirely consistent with the Court's review of the official file and with the Court's observations of Mr. Hecker's role in this litigation.

880

on these facts. Therefore, MaGinnis and Hecker will be permitted to remain as counsel in this case, for as long as the plaintiffs or substitute counsel require the firm's services.

### SUBSTITUTE COUNSEL

█ Substitute counsel shall have full access to the following:

(1) All documents filed of record in this case.

(2) All material that has been made available to either side during discovery.

(3) Copies of all contracts (and any documents incorporated therein by reference) that are in issue in this suit.

(4) Copies of any relevant documents in the possession of Ober, Grimes and Shriver which are available to the public generally, e. g., certificates of incorporation, annual reports, newspaper articles, etc.

(5) Copies of all correspondence between or among Ober, Grimes and Shriver, counsel for the defendants, and the Court.

(6) Copies of any reports or summaries written entirely by plaintiffs' witnesses or expert witnesses.

(7) Any other documents already in the possession of Ober, Grimes and Shriver and counsel for the defendants.

Cf. *Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago,* 283 F.Supp. 464, 470 (D.Minn.1968), *aff'd* 408 F.2d 1099 (8th Cir. 1969), *cert. denied sub nom., Abramson v. Exchange National Bank of Chicago,* 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73 (1969).

Ober, Grimes and Shriver shall bear the primary burden of producing all such materials and turning them over to substitute counsel. Defendants' counsel shall cooperate fully, if necessary, in helping to supply the materials referred to in items (2), (5) and (7).

For the time being substitute counsel will not be permitted to consult with Ober, Grimes and Shriver about the case, nor will counsel be permitted access to the firm's work product. Under certain circumstances

work product may be turned over following disqualification (see *International Business Machines Corp. v. Levin,* 579 F.2d 271, 283 (3d Cir. 1978)), but it is unclear whether substitute counsel should be permitted such access where the original counsel is disqualified under the "substantial relationship" test. Cf. *First Wisconsin Mortgage Trust v. First Wisconsin Corp.,* 571 F.2d 390 (7th Cir. 1978).

The Court will not decide now whether turnover of work product in this case is proper. That decision must await some action by substitute counsel to obtain such material. If a motion for access to work product is made, the parties will of course be permitted to brief the issue at that time.

The plaintiffs will be required to retain substitute counsel and complete the transfer of the materials listed above within thirty (30) days of the filing of this opinion.