## Lavenson v. Loomis

*Arthur Wolk,* for plaintiff.
*Daniel Huyett,* for defendants.

LAWRENCE, *J.,* August 8, 1990 — Plaintiff, Jay Lavenson, appeals from this court's order of June 19, 1990 granting defendants' petition to disqualify plaintiff's attorney from further representation of plaintiff in this action.[1]

## BACKGROUND

On October 17, 1989 Jay Lavenson filed suit against Aviation Insurance Center Inc., James Loomis and The Loomis Companies, Ltd. for breach of an employment contract, tortious interference with that contract and non-payment of commissions while plaintiff was employed as president of AIC from 1985 to 1988. Throughout this period, Loomis and his wife were the sole shareholders of AIC. Loomis was the president and the chairman of

---

1. Defendants have filed a motion to quash plaintiff's appeal wherein they contend that the June 19, 1990 order is interlocutory and therefore not appealable. While there is considerable authority in support of the order being considered non-appealable at this stage (see *Middleberg v. Middleberg,* 427 Pa. 114, 233 A.2d 889 (1967); see also 42 Pa.C.S. §702(b), governing interlocutory appeals by permission, under which plaintiff chose not to proceed), we defer to the wisdom of the appellate court on this issue and confine the opinion to the merits of the case.

the board of The Loomis Companies, and he and his wife were the sole shareholders of that company.

On November 13, 1989, defendants filed the within petition to disqualify plaintiff's counsel, Arthur Wolk, which was granted.

## DISCUSSION

A trial court is authorized to disqualify an attorney where there has been a breach of the Rules of Professional Conduct. See *Slater v. Rimar Inc.,* 462 Pa. 138, 338 A.2d 584 (1975). Defendants claim that two fundamental rules of ethical conduct have been violated by plaintiff's attorney. First, they contend that plaintiff's attorney has run afoul of Pennsylvania Rule of Professional Conduct 1.6, which charges an attorney with the ethical obligation to preserve confidential client information. Subsection (d) of this rule provides that this duty outlasts the termination of the lawyer's employment.

Second, defendants assert that plaintiff's attorney is in violation of rule 1.9, which sets forth an attorney's required conduct with regard to his or her conflict of interest with former clients:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

"(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation."

Disqualification of an attorney on the ground of conflict of interest is thus justified if a court finds (1) the existence of a prior attorney-client relationship between the party seeking disqualification and the attorney in question, and (2) the matters involved in the current action are substantially related to the

subject matter of the former representation. *North Penn Hospital v. Hughes Foulkrod Construction Co.*, 22 D.&C. 3d 652 (1981).

Disqualification is essential in the present case. Defendants are Wolk's former clients, and the present litigation bears a substantial relationship to the prior representation.

A significant part of plaintiff's lawsuit and defendants' petition to disqualify centers on a program known as the Helicopter Association Insurance program. The program itself was to evolve from a formal written agreement between Helicopters Association International, an organization of helicopter owners and operators, and AIC, an insurance agency. Under this agreement, AIC was to find favorable insurance coverage for HAI members who received helicopter training and who properly maintained their helicopters.

The groundwork for the HAI program was laid from 1985 to 1987, when extensive negotiations between the principals of both AIC and HAI took place and an agreement between them was finalized. The instant petition arises out of Arthur Wolk's involvement in effectuating this agreement. There is no dispute that Wolk was involved in the HAI agreement. Wolk contends, however, that his involvement was solely limited to representing Jay Lavenson personally[2] and that he did not represent the defendants. Conversely, the defendants assert that although they never formally retained Wolk to represent them with regard to HAI and despite no fee ever having been paid to Wolk as a result of his

---

2. Lavenson was an insurance consultant who was president of AIC from July 1985 to December 1988. He was also Wolk's longtime personal friend who hoped to retire on commissions from the HAI program.

work, he was their counsel in connection with the HAI/AIC agreement.

The existence of an attorney-client relationship does not depend on either an explicit agreement or the payment of a fee. *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371 (S.D. Texas, 1969); *Hendershot v. Hendershot*, 28 D.&C. 3d 239 (1982). The existence of an attorney-client relationship may be implied from the conduct of the parties. *E.F. Hutton & Co.*, *supra*. The existence of the attorney-client relationship can also be found when it is not unreasonable for the client to have understood that he or she was represented by a particular attorney. *Id.* Whether an attorney-client relationship existed depends on the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional advice. *Westinghouse Electric v. Kerr-McGee Corp.*, 480 F.2d 1311 (7th Cir. 1978). Even an implied professional relationship can result in a finding of a conflict of interest. *Id.*

The nature of Wolk's participation in the HAI program is delineated by the deposition testimony of Wolk, Lavenson, Loomis and the documentary evidence of record related to the HAI/AIC transaction. James Loomis testified at his deposition that he believed Wolk represented AIC, himself and The Loomis Companies in connection with the HAI program. (Loomis deposition at 20, 24, 29, 51.) He stated that Wolk not only participated in the negotiation of the HAI/AIC agreement, he was also involved in the drafting phase. (Loomis deposition at 57.)

An initial draft of the HAI/AIC agreement was sent to Wolk and placed into his law office word processor. (Lavenson deposition at 58-9.) Wolk made substantial changes to this draft. (Lavenson

deposition at 63-4; 200144-200154.)[3] After this, Wolk had ongoing involvement in the drafting of the document. For instance, Wolk's letter of August 13, 1986, addressed to Lavenson as president of AIC, stated that he was forwarding to Lavenson as president of AIC a draft of the AIC/HAI agreement. (Wolk deposition at 20-1; 200174.) He attached a draft of the HAI agreement which he acknowledged was in his own handwriting. (Wolk deposition at 22; 200206-200220.) Additionally, in a November 4, 1986 letter from Wolk to Loomis, Lavenson and Peter Meshin, AIC Director of Operations, Wolk enclosed a copy of another revised HAI agreement for their review and thanked them "for the opportunity to participate in drafting this document." (Wolk deposition at 33, 35; 200140.)

In a November 10, 1986 letter to James Loomis and Jay Lavenson, Wolk stated that he was enclosing still another revised HAI agreement to "include the changes Jim requested." (Wolk deposition at 33; 200138.)

Most significantly, a review of the first page of any of these drafts indicates that the agreement was at all times between HAI and AIC, not Jay Lavenson. Lavenson was not a party to the HAI/AIC agreement. Any legal representation Wolk provided to Lavenson was done in Lavenson's capacity as president of AIC.

The record is clear that during the HAI/AIC negotiations, the only attorney on the AIC side was Wolk. (Loomis deposition at 65; Lavenson deposition at 83.) Representatives of HAI corresponded directly with Wolk on a number of matters relating to the HAI agreement, and he was frequently

---

3. The six-digit numbers referred to in the citations correspond to exhibits which were identified and discussed at the depositions.

carbon-copied on communications between various parties relating to HAI program issues. (Loomis deposition at 126, 133-4, Lavenson deposition at 35; 100045, 100019-100020.) During a meeting in Arlington, Virginia between AIC and HAI at which HAI president and attorneys were present, as well as Loomis, Lavenson and Peter Meshin, Wolk participated in a telephone conference call. At that time he discussed with the representatives of those corporations the issue of AIC's potential liability as a result of advertisements and promotions relating to helicopter manufacturers' training programs. (Lavenson deposition at 56-7.) Wolk himself admitted to having spoken directly to Loomis about the HAI program on another occasion as well. (Wolk deposition at 23-4.)

Wolk advocated on behalf of AIC on other key aspects of the agreement. Wolk made numerous suggestions to help eliminate, or reduce, risks to AIC incurred as a result of the HAI program. In March 1987, he formulated language to appear in promotional brochures and advertisements produced and distributed by AIC as a part of the HAI program. This language had the effect of further decreasing AIC's liability exposure. (Wolk deposition at 35-6; Lavenson deposition at 72-3; 200106.) He was also instrumental in creating a safety enhancement program in April 1987 to be part of the HAI agreement. (Lavenson deposition at 75-6; 20081.) In addition, he reviewed documents involving AIC's efforts to contract with underwriters for the HAI program. (Lavenson deposition at 78; 200012-200033.)

In addition to Loomis believing that Wolk was AIC's counsel on the HAI agreement, Loomis was also under the impression that Wolk was the attorney representing Loomis' individual interests and

those of his independent entities. This is supported by the evidence.

One of Loomis' primary concerns throughout the negotiations was that neither Loomis individually nor The Loomis Companies be exposed to liability as a result of the HAI program. In his professional capacity as an attorney, Wolk rendered legal advice to Loomis and The Loomis Companies on this issue. Wolk was successful in implementing changes in the HAI agreement so as to address fully Loomis' concerns. Loomis testified as follows at his deposition:

"He [Wolk] was advising us, myself and Mr. Lavenson on how to remove myself and Loomis Companies from any potential liability lawsuits that could be brought in connection with the HAI helicopter program." (Loomis deposition at 23.)

"We agreed to hire Mr. Wolk to negotiate the HAI agreement to protect not only AIC but myself and Loomis companies." (Loomis deposition at 29.)

"The legal side of the contract was a great concern for myself and Mr. Lavenson. And Mr. Wolk was keeping The Loomis Companies, myself removed from the program being that this was [sic] high liability limits. I did not want to be exposed or to expose any of the other entities to a potential lawsuit." (Loomis deposition at 81.)

Correspondence transmitted by the figures involved in the HAI program further reflects that it was Wolk who was sought, time and again, to address Loomis' concerns about his exposure in the HAI program. For example, a March 30, 1987 letter from Lavenson to Wolk illustrates that Wolk's counsel was needed on an HAI proposal directed to James Loomis in his capacity as chairman of the board of The Loomis Companies. In the letter, Lavenson directs Wolk to discuss and resolve with

"Jim" his desire to "make absolutely certain The Loomis Companies will not be involved legally or brought in any other way if [sic] the event HAI tries to find its way around AIC by going against The Loomis Companies and/or Jim Loomis have done absolutely nothing." (Lavenson deposition at 74-5; 200085.)

Similarly, an April 2, 1987 letter from Wolk to James Loomis highlights Wolk's acknowledgment of interests critical to defendants. In that letter, Wolk sent Loomis, for his review and signature, a proposed agreement with HAI concerning The Loomis Companies' liability in the HAI program. (Loomis deposition at 131-3; Loomis deposition at 25.)

Clearly, Wolk's accommodation of Loomis' concerns for his own potential liability exposure and for that of his affiliated companies on these (and other) occasions undermines Wolk's assertion that he was only Lavenson's counsel. Indeed, Wolk's' conduct in pursuing an agreement with HAI on behalf of AIC while ensuring that the interests of Loomis and The Loomis Companies remained intact generated a reasonable belief among the defendants that Wolk was acting on their behalf.

Furthermore, although no fee was actually paid to Wolk, there was a discussion between Lavenson and Loomis regarding payment of a $10,000 fee to Wolk for legal work he performed on the HAI deal. The following exchange took place at Lavenson's deposition between Mr. Lavenson and defendants' attorney:

Q: Mr. Lavenson, there was a discussion before Mr. Wolk became involved in the HAI agreement or program . . . about paying him a $1,000 fee; do you remember that?

A: No. I remember the discussion did not take place before.

Q: When did it take place then?

A: Many months after.

Q: And that would be sometime during 1986?

A: Yes, I guess.

Q: In any event, it would be before the end of 1986; would it not?

A: . . . Yes. The discussion, you mean?

Q: Right. And you discussed with Loomis the possibility of paying Mr. Wolk a nominal fee of $1,000?

A: No. . . . Jim Loomis said to me that he thought at some time down the line we ought to send Arthur $10,000..

Q: And you said?

A: And I said that might be appropriate. Let's see what happens, but I'm not sure about it at this time.

Q: . . . Your recollection of any fee that would be paid to Mr. Wolk for his involvement on behalf of AIC is in connection with the $10,000 fee that you just referred to earlier; is that correct?

A: Yep. (Lavenson deposition at 84-5.)

While we stated previously that the existence of an attorney-client relationship between Wolk and the defendants was not dependent upon payment of legal fees to Wolk, Loomis' contemplation of rendering a large sum of money to Wolk in 1986 certainly suggests that such a relationship existed at that time. Based on this and the other evidence presented, we agree with defendants that they could have reasonably believed that Wolk was acting in their interests during the formation of the HAI agreement and that therefore, at the very least, an implied attorney-client relationship existed.

This is not to suggest that Wolk is being disingenuous. He may have truly believed that only Laven-

198

son was his client and that his assistance to Loomis and The Loomis companies was incidental to that representation.[4] But even Wolk's perception of the situation is not dispositive of the issue before this court. Regardless of what Wolk may have thought about the scope of his representation, his efforts were at all times directed at negotiating and drafting the most favorable HAI agreement possible on behalf of AIC and one not inimical to the interests of James Loomis individually and as owner of The Loomis Companies. Under these circumstances, the defendants' belief that Wolk was their attorney was certainly reasonable.

The second element necessary to disqualify an attorney, i.e. that a substantial relationship exists between the present action and the prior representation, is present in this case as well. The substantial relationship test does not require that the former and present suits involve similar causes of action; the two cases may be entirely dissimilar. *Realco Services Inc. v. Holt,* 479 F.Supp. 867 (E.D. Pa. 1979.) Rather, the test has been interpreted to mean that if the client in the prior representation "might have" imparted confidential information to his lawyer to aid the lawyer in dealing with particular issues, and if issues arise in the second suit which would permit the use of such confidences against the original client, the substantial relationship test is met, and disqualification is required. *Id.*

The lawyer "might have acquired" the information in issue if (a) the lawyer and the client ought to

4. Wolk mentioned in his deposition that the HAI program was supposed to be Lavenson's personal enterprise and that AIC was brought in only to honor HAI's need to negotiate with a corporation. (Wolk deposition at 28-9.) Wolk stated, however, that *it was not determined at the time if the HAI program was personal for Lavenson.* (Wolk deposition at 22.)

have talked about particular facts during the course of the representation, or (b) the information is of such a character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship. *Id.* Further, a finding of a substantial relationship between the prior representation and the present suit raises an "irrebuttable presumption" that confidential information was disclosed during the course of the prior representation. *Oyster v. Bell Asbestos Mines,* 568 F.Supp. 80 (E.D. Pa. 1983).

In the case at bar, plaintiff's complaint includes the following allegations, (1) the defendants extracted and usurped the HAI/AIC program concept from Lavenson; (2) defendants interfered with Lavenson's performance of his employment by AIC and, in particular, with his performance on the HAI program; (3) the defendants wrongfully denied plaintiff commissions due him in connection with the HAI program; and (4) Loomis defamed plaintiff to HAI principals in a letter concerning plaintiff's performance on the HAI deal. Plaintiff asserts that he conceived the idea for the HAI program, that he contacted insurance markets with which he was familiar and had prior relationships in order to establish a basis for the program and that he cultivated and interested the insurance marketplace to put the program into effect.

Loomis attempted to articulate the flavor of the confidential communications he related to Wolk. He testified that Wolk was "privy to all the intricate works of the program and how it got done and the percentages that the manufacturers participated in . . . He was also privy to the underwriting companies that we spoke to." (Loomis deposition at 84.)

Loomis also provided Wolk with information concerning the structure of The Loomis Companies.

(Loomis deposition at 124.) In this regard, Loomis stated, "Arthur, knowing how I think and deal and having the information how the program works, the continual connections between myself and all the entities, obviously gives him a very decisive edge on filing the lawsuit against me." (Loomis deposition at 94.)

Concerning discussions with Wolk about Lavenson, Loomis testified, "I discussed with Mr. Wolk some of the matters that Mr. Lavenson wants to try to place in his program and told him some of the inside information that I had found out from the carriers." (Loomis deposition at 102.)

Loomis had told Wolk that he did not want Lavenson to know about their discussion of "how he [Lavenson] presented himself and how he presented the program, the numbers he used, the lies he told." (Loomis deposition at 102.)

He also had a "discussion [with Wolk] in how Jay represented himself, not only to what he had completed or what he thought he had completed as far as the HAI program and the amount of business he could produce." (Loomis deposition at 92.)

Given Wolk's close contact with defendants and the HAI program, almost from its inception, it would not have been unusual for these communications to have taken place between Wolk and defendants, as well as other subjects raised in plaintiff's complaint. It is conceivable that Wolk might have learned confidential information that could be used to support plaintiff's position in the present lawsuit. Indeed, plaintiff accuses the defendants of tortious interference with the ideas and the concept underlying the very contract that Wolk drafted on behalf of the defendants. Quite clearly, the information Wolk might have acquired from his previous repre-

sentation is "substantially related" to the subject of plaintiff's lawsuit.

Under these circumstances, Wolk is presumed to possess confidential information that could be useful to Lavenson against his former clients and was properly disqualified from the case. Plaintiff's appeal should, therefore, be dismissed.